

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-21-2002

# Koslow v. Comm of PA

Precedential or Non-Precedential: Precedential

Docket No. 01-2782

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Koslow v. Comm of PA" (2002). *2002 Decisions.* Paper 526.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/526

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

        Filed August 21, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-2782

GEORGE KOSLOW,
        Appellant

v.

COMMONWEALTH OF PENNSYLVANIA
d/b/a DEPARTMENT OF CORRECTIONS;
DONALD T. VAUGHN;
PHICO SERVICES COMPANY;
COMPSERVICES, INC.

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Civil Action No. 97-cv-05951
(Honorable John P. Fullam)

Argued March 5, 2002

Before: SCIRICA and ROSENN, Circuit Judges,
and WARD, District Judge*

(Filed: August 21, 2002)

_____

* The Honorable Robert J. Ward, United States District Judge for the
Southern District of New York, sitting by designation.


        JEFFREY CAMPOLONGO, ESQUIRE
          (ARGUED)
        THOMAS M. HOLLAND, ESQUIRE
        Grace Hall
        1522 Locust Street
        Philadelphia, Pennsylvania 19102

         Attorneys for Appellant

        SETH M. GALANTER, ESQUIRE
          (ARGUED)
        SARAH E. HARRINGTON, ESQUIRE
        United States Department of Justice
        Appellate Section
        950 Pennsylvania Avenue, N.W.
        Washington, D.C. 20530

         Attorneys for Intervenor-Appellant,
        United States of America

        JOHN G. KNORR, III, ESQUIRE
          (ARGUED)
        Office of Attorney General

of Pennsylvania
Department of Justice
Strawberry Square, 15th Floor
Harrisburg, Pennsylvania 17120

Attorney for Appellees,
Commonwealth of Pennsylvania
d/b/a Department of Corrections;
Donald T. Vaughn

ELIZABETH A. MALLOY, ESQUIRE
 (ARGUED)
Klett, Rooney, Lieber & Schorling
Two Logan Square, 12th Floor
18th and Arch Streets
Philadelphia, Pennsylvania 19103

Attorney for Appellee,
PHICO Services Company

2

HOWARD R. FLAXMAN, ESQUIRE
 (ARGUED)
Fox, Rothschild, O'Brien & Frankel
2000 Market Street, 10th Floor
Philadelphia, Pennsylvania 19103

Attorney for Appellee,
CompServices, Inc.

OPINION OF THE COURT

SCIRICA, Circuit Judge.

In this disability discrimination case under the Rehabilitation Act, the principal issue on appeal is whether the Commonwealth of Pennsylvania waived its sovereign immunity by accepting certain federal funds for the Department of Corrections. We will reverse in part and affirm in part.

I.

In October 1988, George Koslow was hired by the Pennsylvania Department of Corrections as a water treatment plant supervisor for the State Correctional Institute in Graterford, Pennsylvania ("SCI-Graterford"), a state prison receiving federal funds under the State Criminal Alien Assistance Program (SCAAP). On June 6, 1995, Koslow injured his lower back loading eighty-pound salt bags into SCI-Graterford's industrial water softener, then reinjured his back performing the same task in September 1995 and November 1996. On each occasion Koslow notified SCI-Graterford's Human Resources Department of his condition, requesting relief from lifting the salt bags and walking stairs. On June 10, 1997, after an investigation, SCI-Graterford officials informed Koslow he either had to return to work at full duty or be placed on

workers' compensation leave. Koslow chose the former, remaining in a position at work that required stair climbing. On February 29, 2000, he was dismissed for being unable to perform "essential functions" of his job.1

---

1. Because of the procedural posture of the case, the record is unclear regarding what "essential functions" Koslow was unable to perform.

Koslow alleged the Commonwealth of Pennsylvania and SCI-Graterford Superintendent Donald Vaughn (collectively, the "Commonwealth defendants") refused to accommodate his disability, violating the Americans With Disabilities Act (ADA), 42 U.S.C. S 12101 et seq., the Rehabilitation Act, 29 U.S.C. S 701 et seq., and the Pennsylvania Human Relations Act (PHRA), 42 Pa. Cons. Stat. Ann. S 951 et seq. Koslow also alleged PHICO Services Co. and CompServices, Inc., his past and present worker's compensation administrators, had wrongfully processed his compensation claims.2 He sought reinstatement and damages.

The District Court granted summary judgment to PHICO and CompServices on Koslow's PHRA and ADA claims, finding that as "agents" of Koslow's "employers," they played no decisionmaking role regarding Koslow's employment. The District Court stayed the remainder of Koslow's action pending resolution of Board of Trustees of the University of Alabama v. Garrett, 531 U.S. 356, 121 S. Ct. 955 (2001), then before the United States Supreme Court, which held Congress's abrogation of states' Eleventh Amendment immunity under Title I of the ADA was invalid. Id. at 965-68.

With the benefit of Garrett and after further briefing, the District Court granted the Commonwealth defendants' motions for summary judgment on Koslow's ADA claims. The District Court found neither the ADA nor the Rehabilitation Act abrogated the Commonwealth's sovereign immunity. It also held the Commonwealth defendants had not waived sovereign immunity on the Rehabilitation Act claims. Therefore, Koslow could not state valid Title I claims against the Department of Corrections under either statute. Nor, the District Court found, could Koslow pursue injunctive relief against SCI-Graterford Superintendent Vaughn under Title I of the ADA. After disposing of Koslow's Title I claims, the District Court also dismissed Koslow's claim under Title II of the ADA. The latter claim is not pursued on appeal.3 As noted, the District Court had

---

2. From 1995 through 1997, PHICO acted as SCI-Graterford's agent in administering its workers' compensation scheme. In December 1997, CompServices replaced PHICO.
3. Title I of the ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability

already dismissed Koslow's PHRA claims against PHICO and CompServices, holding they had played no "decisionmaking" role. This appeal focuses solely on Koslow's Rehabilitation Act claims against the Commonwealth defendants, his Title I claim for injunctive relief under the ADA against SCI-Graterford Superintendent Vaughn, and his PHRA claims against PHICO and CompServices.

II.

The District Court had jurisdiction over Koslow's federal claims under 28 U.S.C. SS 1331 and 1343 and

_____

of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. S 12112(a). Koslow asserted ADA claims under Title I (employment) and Title II-A (public services). As noted, in Garrett, the Supreme Court held Congress's abrogation of states' Eleventh Amendment immunity under Title I of the ADA was invalid. 121 S. Ct. at 965-68. But the Supreme Court held that state officials could be subjected to federal court actions for injunctive relief in violation of Title I. Id. at 968 n.9 ("Those standards can be enforced by the United States in actions for money damages as well as by private individuals in actions for injunctive relief under Ex parte Young, 209 U.S. 123 (1908)).

As to ADA claims under Title II, the District Court offered two justifications for its dismissal. First, the Court held Title I of the ADA is the "sole avenue for pursuing employment discrimination claims based on disability. Title I expressly deals with employment discrimination, while Title II deals with 'services, programs, or activities of a public entity' . . ." Op. at 2 (suggesting this Court "avoided" deciding whether Title II of the ADA allows for an employment discrimination claim based on disability in Lavia v. Pennsylvania, 224 F.3d 190, 194 n.2 (3d Cir. 2000)) (citations omitted). Given Koslow's failure to appeal this issue, we reserve consideration of this point. The District Court also found that in enacting Title II of the ADA, Congress had not validly abrogated states' immunity. Id. at 2-3. We need not reach this issue. Koslow does contest the dismissal of his injunctive relief claims brought against SCI-Graterford Superintendent Vaughn under Title I.

Section 504 of the Rehabilitation Act and Title II of the ADA offer similar protections for persons with disabilities. Although Title II applies to all state and municipal governments, S 504 applies only to those agencies or departments receiving federal funds, andS 504 applies only during the periods during which the funds are accepted.

5

supplemental jurisdiction on his state law claims under 28 U.S.C. S 1367. We have jurisdiction under 28 U.S.C. S 1291.

III.

Certain background information on the federal fiscal connection to the Pennsylvania Department of Corrections, Koslow's employer, is essential here. The Commonwealth of Pennsylvania receives federal funds for various designated purposes. From November 1996 through February 2000, at least forty-two federal grants were provided to the Pennsylvania Department of Corrections.4  The Commonwealth identifies twenty-five of those federal grants as "programs with multiple years of funding." One such "multiple year" program is the State Criminal Alien Assistance Program, originally established to alleviate costs states incur when illegal aliens commit state crimes and are imprisoned in state correctional facilities. Despite its stated purpose, funds received under SCAAP are not necessarily directed by the Department of Corrections toward costs for imprisoned illegal aliens. Nor need the Department of Corrections track these funds or report to the federal government where the funds are allocated. 62 Fed. Reg. 35,232 (June 30, 1997).

The record demonstrates the Commonwealth of Pennsylvania accepted federal funds under SCAAP in 1996, 1997, 1998, and 1999, the relevant dates of this litigation. The parties stipulated the Commonwealth disbursed all of those funds to the Department of Corrections.5 Despite the stipulation, the exact amount of the federal contribution

_____

4. On February 26, 2002, during a Pennsylvania Senate Appropriations Committee Hearing, one senator testified 38,425 prisoners were then incarcerated in Commonwealth prisons, at an approximate aggregate annual cost to the Commonwealth of $1,075,900,000 (estimating $28,000 per prisoner). For fiscal year 2002-03, the proposed budget for the Pennsylvania Department of Corrections is $1,295,214,000.

5. The Department of Corrections also receives federal grant funds from the United States Department of Education, but those funds are managed and administered by a separate Department of Corrections office.

under SCAAP to the Department of Corrections or to SCI-Graterford is not part of the record.

IV.

The most difficult issue in this appeal is whether the Commonwealth defendants waived their sovereign immunity to suit on Koslow's federal Rehabilitation Act claims. There are three related, yet separate and independent, issues -- whether the Commonwealth's acceptance of SCAAP funds means it waived its Eleventh Amendment immunity for Rehabilitation Act suits against a department receiving those funds; whether the Rehabilitation Act, especially 42 U.S.C. S 2000d-7, imposes an "unconstitutional condition" on the Commonwealth's receipt of federal funds; and whether the Rehabilitation Act is valid legislation under the Spending Clause. We exercise

plenary review over these questions of law, Blanciak v.
Allegheny Ludlum Corp., 77 F.3d 690, 694 (3d Cir. 1996),
and, more generally, over the grant of summary judgment.
Doe v. County of Centre, 242 F.3d 437, 446 (3d Cir. 2001).

A.

The Eleventh Amendment to the United States
Constitution provides:

> The Judicial power of the United States shall not be
> construed to extend to any suit in law or equity,
> commenced or prosecuted against one of the United
> States by Citizens of another State, or by Citizens or
> Subjects of any Foreign State.

U.S. CONST. amend. XI. The Eleventh Amendment does not
explicitly apply to cases that do not involve "Citizens of
another State" or "Citizens or Subjects of any Foreign
State."  See Seminole Tribe of Fla. v. Florida, 517 U.S. 44,
54 (1996) ("the text of the Amendment would appear to
restrict only the Article III diversity jurisdiction of the
federal courts"). But as the Supreme Court has held for
over a century, see Hans v. Louisiana, 134 U.S. 1, 13
(1890), the Eleventh Amendment confirms a broader
"background principle of state sovereign immunity."
Seminole Tribe, 517 U.S. at 72.

As developed, the Eleventh Amendment provides states
with immunity not only from suits brought by citizens of
other states, but also from suits brought by their own
citizens. Hans, 134 U.S. at 13-14. Recent cases have
emphasized the Eleventh Amendment's embodiment of this
common law doctrine. E.g., Alden v. Maine, 527 U.S. 706,
713 (1999); P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy,
Inc., 506 U.S. 139, 145-46 (1993) (declaring the Eleventh
Amendment a "fundamental constitutional protection . . .
rooted in a recognition that the States, although a union,
maintain certain attributes of sovereignty, including
sovereign immunity . . . [and] respect owed them as
members of the federation").

But a state's Eleventh Amendment protection from
federal suits -- whether brought by citizens of their state or
another -- is not absolute. Two established exceptions to
the Eleventh Amendment's bar permit individuals to sue
states. Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ.
Expense Bd., 527 U.S. 666, 670 (1999). First, Congress
may authorize such a suit under its power "to enforce the
Fourteenth Amendment -- an Amendment enacted after the
Eleventh Amendment and specifically designed to alter the
federal-state balance." Id. (citing Fitzpatrick v. Bitzer, 427
U.S. 445 (1976)). Under this exception, Congress abrogates
a state's sovereign immunity "when it both unequivocally
intends to do so and 'act[s] pursuant to a valid grant of
constitutional authority.' " Garrett, 531 U.S. at 363 (quoting
Kimel v. Bd. of Regents, 528 U.S. 62, 73 (2000)). Second, a

state may waive its sovereign immunity by consenting to suit. Coll. Sav. Bank, 527 U.S. at 670 (citing Clark v. Barnard, 108 U.S. 436 (1883)); Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 238 (1985). Of course, in addition, a person seeking purely prospective relief against state officials for ongoing violations of federal law may sue under the "legal fiction" of Ex parte Young, 209 U.S. 123, 159-60 (1908), despite the text of the Eleventh Amendment. See Alden, 527 U.S. at 757.

At issue here is whether plaintiffs' Rehabilitation Act claims fall within one of these exceptions. Section 504 of the Rehabilitation Act prohibits discrimination on the basis of disability in federally funded programs or activities: "No

8

otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. S 794(a). In its definitional section, the statute provides:

> For the purposes of this section, the term "program or activity" means all the operations of --
>
> (1)(A) a department, agency, special purpose district, or other instrumentality of a State or local government; or
>
> (B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government agency) to which the assistance is extended, in the case of assistance to a State or local government;
>
> . . . any part of which is extended Federal financial assistance.

29 U.S.C. S 794(b).

There have been many suits under the Rehabilitation Act against sovereign states. Indeed, "[t]he Rehabilitation Act has a long history of scrutiny under the Eleventh Amendment." Nihiser v. Ohio EPA, 269 F.3d 626, 628 (6th Cir. 2001). In Atascadero State Hospital, the Supreme Court held that despite the language of S 504, it was not sufficiently clear that Congress intended states' receipt of federal funds under the statute to constitute a waiver of Eleventh Amendment immunity. 473 U.S. at 247 (finding the Act fell "far short of manifesting a clear intent to condition participation in the programs funded under the Act on a State's consent to waive its constitutional immunity"). The next year, Congress amended S 504 to provide specifically that: "A state shall not be immune under the Eleventh Amendment of the Constitution of the

United States from suit in Federal court for a violation of
section 504 of the Rehabilitation Act of 1973 . . . ." 42
U.S.C. S 2000d-7(a)(1).

In its sovereign immunity analysis, the District Court
rejected the possibility that Congress had validly abrogated
the Commonwealth's immunity under the Fourteenth
Amendment. The District Court held the 1986 amendment
to the Rehabilitation Act represented an "unequivocal[ ]
express[ion]" of Congress's desire to abrogate states'
immunity. Op. at 4. But this factor alone, the court held,
was insufficient to abrogate the Department of Corrections's
immunity under the Eleventh Amendment:

> The second part of the test [for abrogation], however, is
> "congruence and proportionality" -- that is, whether
> Congress has identified a "pattern of discrimination by
> the States which violates the Fourteenth Amendment,
> and [whether] the remedy imposed by Congress .. . is
> congruent and proportional to the targeted violation."
> Garrett, 121 S. Ct. at 967-68. No specific
> unconstitutional conduct by the states was identified
> by Congress, and therefore S 504 must fall victim to the
> same fate that has lately befallen other
> antidiscrimination statutes insofar as they are applied
> to the states.

Op. at 4.6

The District Court then considered whether the
Commonwealth had waived its sovereign immunity by
consenting to suit. The District Court rejected this
possibility as well:

> The only way that plaintiff can assert a claim under
> S 504, then, is if the Commonwealth of Pennsylvania
> has waived its sovereign immunity. It clearly has not
> done so explicitly, as there is no legislation that can be
> so construed. In order for Pennsylvania to have
> implicitly waived its immunity by accepting federal
> funds, the conditions on the grant of money must be
> unambiguously expressed by Congress. Congress must
> also be specific; a "general authorization" does not
> suffice. . . . As plaintiff does not argue that there is any

---

6. In support, the District Court cited Garrett, Kimel, City of Boerne v.
Flores, 521 U.S. 507 (1997), and Chittister v. Department of Community
and Economic Development, 226 F.3d 223 (3d Cir. 2000). Op. at 4-5.

> connection between federal funds received by the state
> and his Rehabilitation Act claim, I hold that the
> Commonwealth of Pennsylvania has not waived its
> sovereign immunity in this case.

Op. at 5-7. In reaching this result, the District Court endorsed the dissenting opinion in Jim C. v. United States, 235 F.3d 1079, 1082-85 (8th Cir. 2000) (en banc) (Bowman, J., dissenting), which required "a nexus between the purposes of the federal funding and the conditions placed on their receipt." Op. at 6.

We reserve consideration on the abrogation issue. But we disagree with the able District Court's conclusions on the Commonwealth's waiver of sovereign immunity. The Supreme Court has recognized S 504 of the Rehabilitation Act, following the 1986 amendment, to be an "unambiguous waiver of the State's Eleventh Amendment immunity." Lane v. Pena, 518 U.S. 187, 200 (1996). As noted, the 1986 amendment was enacted in response to the Supreme Court's decision in Atascadero State Hospital v. Scanlon, 473 U.S. 234 (1985), which held that "mere receipt of federal funds" was insufficient to constitute a waiver of sovereign immunity to Rehabilitation Act claims. Id. at 246. The Atascadero State Hospital Court stated that if a statute "manifest[s] a clear intent to condition participation in the programs funded under the Act on a State's waiver of its constitutional immunity," federal courts would have jurisdiction over claims against states accepting federal funds. Id. at 247.

It appears that Congress responded to the Supreme Court's direction. Section 2000d-7 of the Rehabilitation Act,[7] as amended, represents a "clear intention," as mandated by Atascadero State Hospital. Enacting the amendment to S 2000d-7, Congress put states on notice that by accepting federal funds under the Rehabilitation Act, they would

_____

7. This appeal implicates several statutes. Section 2000d-7, as amended, provides states cannot be immune under the Eleventh Amendment from suits in federal court under S 504 of the Rehabilitation Act. Section 504 of the Rehabilitation Act, in turn, prohibits discrimination against persons with disabilities under "any program or activity receiving Federal financial assistance." Section 504 is codified at 29 U.S.C. S 704(a).

11

waive their Eleventh Amendment immunity to Rehabilitation Act claims.[8] Accord United States Dep't of Transp. v. Paralyzed Veterans of Am., 477 U.S. 597, 605 (1986) ("Under . . . Title VI, Title IX, and S 504, Congress enters into an arrangement in the nature of a contract with the recipients of the funds: the recipient's acceptance of the funds triggers coverage under the nondiscrimination provision.").[9] In Lane, the Supreme Court recognized the "care with which Congress responded to our decision in Atascadero by crafting an unambiguous waiver of the States' Eleventh Amendment immunity." 518 U.S. at 200.

Six other courts of appeals have found under the plain language of the amended Rehabilitation Act statute that accepting federal funds results in a waiver of Eleventh

Amendment immunity for the "program or agency" receiving the funds. Nihiser, 269 F.3d at 628-29; Jim C., 235 F.3d at 1081-82; Stanley v. Litscher, 213 F.3d 340, 344 (7th Cir. 2000); Pederson v. La. St. Univ., 213 F.3d 858, 875-76 (5th Cir. 2000); Sandoval v. Hagan, 197 F.3d 484, 493-94 (11th Cir. 1999), rev'd on other grounds, 532 U.S. 275 (2001); Litman v. George Mason Univ., 186 F.3d 544, 554 (4th Cir. 1999); Clark v. California, 123 F.3d 1267, 1271 (9th Cir. 1997). We agree with their conclusions.

Under the statutory definitions in the Rehabilitation Act, the state, as a whole, cannot be a "program or activity." As other courts have noted, if the entire state government were

---

8. To reiterate, the 1986 amendment provides:"A state shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973 . . . ." 42 U.S.C.S 2000d-7(a)(1).

9. While the 1986 amendment was under consideration, the Department of Justice stated to Congress, "To the extent that the proposed amendment is grounded on congressional spending powers, [it] makes it clear to states that their receipt of Federal funds constitutes a waiver of their [E]leventh [A]mendment immunity." 132 CONG. REC. 28,624(1986). When signing the bill, President Reagan explained the Rehabilitation Act "subjects states, as a condition of their receipt of federal financial assistance, to suits for violation of federal laws prohibiting discrimination on the basis of handicap, race, age, or sex to the same extent as any other public or private entities." 22 Weekly Comp. Pres. Doc. 1421 (Oct. 27, 1986), reprinted in 1986 U.S.C.C.A.N. 3554.

12

subject to S 504 whenever one of its components received federal funds, subsection (b)(1)(B) would be redundant. See Jim C., 235 F.3d at 1081 n.3 (noting that under the flawed interpretation, "both the distributing and receiving state entities would already be covered under (b)(1)(A) whenever either receives federal funds"); Lightbourn v. County of El Paso, 118 F.3d 421, 427 (5th Cir. 1997); Schroeder v. City of Chicago, 927 F.2d 957, 962 (7th Cir. 1991). But state departments or agencies receiving federal funds, like the Pennsylvania Department of Corrections, qualify under the relevant statutory definition. 29 U.S.C. S 794(b)(1)(A).

Therefore, if a state accepts federal funds for a specific department or agency, it voluntarily waives sovereign immunity for Rehabilitation Act claims against the department or agency -- but only against that department or agency. See Coll. Sav. Bank, 527 U.S. at 675 (describing these determinations as "stringent," in part because of the Eleventh Amendment's important federal purpose); see also Jim C., 235 F.3d at 1081-82:

      To avoid the effect of Section 504 . . . the State would be required to sacrifice federal funds only for that department. This requirement is comparable to the ordinary quid pro quo that the Supreme Court has

repeatedly approved; the State is offered federal funds for some activities, but in return, it is required to meet certain federal requirements in carrying out those activities.

(citations omitted).10

_____

10. In two recent cases, the courts held that a state is not protected by sovereign immunity against a suit against state officials by a person claiming benefits promised under the federal Medicaid law. See Westside Mothers v. Haveman, 289 F.3d 852, 857 (6th Cir. 2002) ("If a state does choose to participate [in the Medicaid program], Congress may then condition receipt of federal moneys upon compliance with federal and statutory directives . . . . A state can decline to participate in Medicaid.") (quotations and citations omitted); Antrican v. Odom, 290 F.3d 178, 190 (4th Cir. 2002) ("North Carolina elected to participate in the federal Medicaid program and, therefore, to be bound by the requirements of the Medicaid Act. In doing so, the State agreed to the conditions of participation, including the possibility that if it failed to conform to the program as established by federal law, it faced the risk of being ordered by a federal court to correct the problems in its system. If the State did not want to face this federal involvement, it was free to decline federal funds . . . or to decline to operate such a program at all.").

13

In this sense, the scope of the Eleventh Amendment immunity waiver directly correlates to the state department or agency receiving federal financial assistance. The Commonwealth of Pennsylvania arguably could limit its waiver by foregoing certain federal funds. The Court of Appeals for the Eighth Circuit explained:

> A State and its instrumentalities can avoid Section 504's waiver requirement on a piecemeal basis, by simply accepting federal funds for some departments and declining them for others. The State is accordingly not required to renounce all federal funding to shield chosen state agencies from compliance with Section 504.

Jim C., 235 F.3d at 1081. But the Rehabilitation Act's definition of "program or activity" sweeps "all the operations" of a department or agency receiving federal financial assistance under the Act's coverage. 29 U.S.C. S 794(b). Although a particular "activity" (e.g., SCAAP) -- or the conduct of that "activity" (e.g., funding inmate educational programs) -- might be the state's only link to federal funds, the waiver under S 2000d-7 is structural. It applies to "all the operations" of the department or agency receiving federal funds (i.e., the Pennsylvania Department of Corrections).

A state's waiver of sovereign immunity is not lightly granted. The Supreme Court has cautioned: "In deciding whether a State has waived its constitutional protection under the Eleventh Amendment, we will find waiver only where stated 'by the most express language or by such

overwhelming implications from the text as [will] leave no room for any other reasonable construction.' " Edelman v. Jordan, 415 U.S. 651, 673 (1974) (quoting Murray v. Wilson Distilling Co., 213 U.S. 151, 171 (1909)). Mere participation in a federal program is not sufficient to waive immunity. Id. at 673. But where a state participates in a federal financial assistance program "in light of the existing state of the law," the state is charged with awareness that accepting federal funds can result in the waiver of Eleventh Amendment immunity. Id. at 687. In Lane , the Supreme Court said S 2000d-7 represents "the most express language" of waiver of Eleventh Amendment immunity. 518

14

U.S. at 200. The Commonwealth of Pennsylvania could reasonably expect that providing federal funds to the Department of Corrections could lead to the waiver of Eleventh Amendment immunity against Rehabilitation Act claims. Accord Stanley, 213 F.3d at 344 ("[T]he ADA and the Rehabilitation Act are identical for purposes ofS 5. But the Rehabilitation Act also is a condition on the receipt of federal funds . . . . [T]he Rehabilitation Act is enforceable in federal court against recipients of federal largess.").

As noted, the District Court relied on the dissenting opinion from Jim C. in rejecting Koslow's claim. The en banc Court of Appeals for the Eighth Circuit in Jim C. rejected this analysis, holding, "Congress may require a waiver of state sovereign immunity as a condition for receiving federal funds, even though Congress could not order the waiver directly." 235 F.3d at 1081. We agree.11

The Commonwealth of Pennsylvania accepted federal financial assistance under SCAAP, and provided these federal funds to the Department of Corrections. Therefore, the Commonwealth of Pennsylvania waived immunity for S 504 claims against its Department of Corrections under the Rehabilitation Act. Like the majority of courts that have considered the issue, we hold the Commonwealth's acceptance of Rehabilitation Act funds falls under the second recognized exception to Eleventh Amendment immunity.12

_____

11. The District Court and the dissenting judge in Jim C. also focused on the possible "coercion" engendered by the federal funding of particular state programs or activities. Those arguments are considered in the subsequent section on "unconstitutional conditions." The District Court's adoption of a "nexus" requirement under South Carolina v. Dole, 483 U.S. 203 (1987), is treated in the section relating to the Spending Clause.

12. In Garcia v. S.U.N.Y. Health Sciences Ctr. of Brooklyn, 280 F.3d 98 (2d Cir. 2001), the Court of Appeals for the Second Circuit held that S 504 of the Rehabilitation Act "constitutes a clear expression of Congress's intent to condition acceptance of federal funds on a state's waiver of its Eleventh Amendment immunity." Id. at 113. But the court found the waiver was ineffective because in 1995, the last date of

discrimination, the state agency did not "know" Title II was effective and

B.

The Commonwealth defendants also urge affirmance on
two related grounds. First, they contend the provisions
placed on their receipt of Rehabilitation Act funds
constitute "unconstitutional conditions," requiring a
"surrender" of constitutionally protected rights. Cf. Frost &
Frost Trucking Co. v. R.R. Comm'n, 271 U.S. 583, 593-94
(1926) ("[T]he state . . . may not impose conditions which
require the relinquishment of constitutional rights.. . . It is
inconceivable that the guaranties embedded in the
Constitution of the United States may thus be manipulated
out of existence."). Because the federal government is not
required to provide states with funds does not mean it may
condition distributions on arguably unconstitutional
grounds. E.g., Speiser v. Randall, 357 U.S. 513, 526 (1958)
(the government may not act indirectly "to produce a result
which [it] could not command directly"). We exercise
plenary review.

The "constitutionally protected right" the Commonwealth
defendants contend they must "sacrifice" upon accepting
federal funds is their Eleventh Amendment immunity from
suits under the Rehabilitation Act. The Commonwealth
defendants draw analogies to select seminal -- and dated --
"unconstitutional conditions" cases,13 when the Supreme
Court struck down states' attempts to force certain litigants
to waive immunity from suit in state court. Cf. Barron v.
Burnside, 121 U.S. 186, 199 (1887) ("As the Iowa statute
makes the right to a permit dependent on the surrender by

_____

would therefore believe Title II's abrogation for Title II claims made
S 504's waiver redundant. Id. at 114. This argument was not briefed or
argued before the District Court. We note, however, that the ADA was
not enacted to alter existing causes of action. See 42 U.S.C. S 12201(b)
(retaining existing causes of action). Therefore, the "clear intent to
condition participation in the programs funded," required by Atascadero,
473 U.S. at 247, ensured the Commonwealth of Pennsylvania knew that
by accepting certain funds under the Rehabilitation Act for certain
departments or agencies, it waived immunity from suit on Rehabilitation
Act claims for those entities.

13. Of course, the "unconstitutional conditions" doctrine boasts a long
history reaching into more contemporary decisions.

the foreign corporation of a privilege secured to it by the
constitution and laws of the United States, the statute
requiring the permit must be held to be void."); Home Ins.
Co. v. Morse, 87 U.S. 445, 458 (1874) ("The Constitution of
the United States secures to citizens of another State than
that in which suit is brought an absolute right to remove

their cases into the Federal court upon compliance with the terms of the act of 1789. The statute of Wisconsin is an obstruction to this right, is repugnant to the Constitution of the United States and the laws in pursuance thereof, and is illegal and void.").

More recently, the Supreme Court held Congress may condition the receipt of federal funds on a state's relinquishment of certain immunities. E.g., Alden, 527 U.S. at 755 ("the Federal Government [does not] lack the authority or means to seek the States' voluntary consent to private suits"); Coll. Sav. Bank, 527 U.S. at 686 (allowing Congress to condition the exercise of an Article I power on a state's agreement to relinquish Eleventh Amendment immunity). The Eleventh Amendment issue the Commonwealth defendants now raise was not precisely before the Supreme Court in Alden or College Savings Bank.14 Nonetheless, we believe conditioning federal funds on the waiver of sovereign immunity under the Eleventh Amendment is not unconstitutional per se. The "unconstitutional conditions" doctrine is based on the proposition that government incentives may be inherently coercive. See Frost & Frost Trucking Co., 271 U.S. at 593 ("In reality, the carrier is given no choice, except a choice between the rock and the whirlpool -- an option to forego

---

14. Alden, which principally addressed Congress's Article I powers of abrogation, did not involve the receipt of federal funds under the Rehabilitation Act, but a state's immunity from suit in its own courts. Nevertheless, the Alden Court reiterated,"[W]e have not questioned the general proposition that a State may waive its sovereign immunity and consent to suit." 537 U.S. at 737 (citing Seminole Tribe, 517 U.S. at 65)). College Savings Bank, in which the Supreme Court rejected petitioner's argument that a state had "impliedly" or "constructively" waived its immunity from Lanham Act suits in federal court, 527 U.S. at 676-77, recognized that an "unequivocal" waiver of a state's sovereign immunity was constitutionally possible. Id. at 680-81.

17

a privilege which may be vital to his livelihood or submit to a requirement which may constitute an intolerable burden."). But the Supreme Court has not yet applied the "unconstitutional conditions" doctrine to cases between two sovereigns. Unlike private persons, states have the resources to serve their citizens even if the federal government, through economic incentives, encourages a particular result. Cf. New York v. United States , 505 U.S. 144, 171-72 (1992) ("Where the recipient of federal funds is a State, as is not unusual today, the conditions attached to the funds by Congress may influence a State's legislative choices."); Dole, 483 U.S. at 210-11 (Congress could influence states' authority over the legal drinking age because "[w]ere South Dakota to succumb to the blandishments offered by Congress and raise its drinking age to 21, the State's action in so doing would not violate the constitutional rights of anyone"). A state's political powers -- not the least of which is the power to levy taxes

on its citizens -- help ensure the federal government does not "coerce" the state through economic "encouragement." An individual citizen, in contrast, lacks these formidable institutional resources.

As noted, the Commonwealth could avoid S 504 claims against the Department of Corrections by declining all federal funds to the Department of Corrections. Though this "sacrifice" would doubtless result in some fiscal hardship -- and possibly political consequences-- it is a free and deliberate choice by the Commonwealth that does not rise to the level of an "unconstitutional condition." The Commonwealth remains free to make the choice: it may decline federal aid to the Department of Corrections, but having accepted the federal funds, it is bound by conditions of the Rehabilitation Act. By accepting SCAAP funds, the Commonwealth opens the Department of Corrections to suits under the Rehabilitation Act. For these reasons, we reject the contention that the receipt of federal funds constitutes "surrender" of Eleventh Amendment immunity and is therefore an "unconstitutional condition."[15]

---

15. The parties dispute the authority of Petty v. Tennessee-Missouri Bridge Commission, 359 U.S. 275 (1959), where the Supreme Court

18

C.

The Commonwealth defendants also maintain the conditions placed on the receipt of Rehabilitation Act funds are so "unrelated" to the "purpose" of the federal funds as to violate the Spending Clause. U.S. CONST. art. I, S 8, cl. 1. Specifically, the Commonwealth defendants suggest the federal government's interest in particular programs or projects of the Department of Corrections is too attenuated from the "general" waiver of immunity respecting Rehabilitation Act claims. We exercise plenary review over this question of law.

Federal statutes are presumed constitutional. Reno v. Condon, 528 U.S. 141, 147 (2000); Union Pac. R.R. Co. v. United States, 99 U.S. (9 Otto) 700, 718 (1878). Nevertheless, Congress's spending power is subject to certain restrictions. United States v. Butler , 297 U.S. 1, 78 (1936). Spending Clause legislation must: (1) pursue the

---

upheld Congress's acquiescence to a bi-state compact between Tennessee and Missouri based on the states' agreement to confer federal jurisdiction on claims against the compact. Id.  at 277, 281-82. If Congress can never require a state to waive Eleventh Amendment immunity in exchange for a federal benefit, Petty would have been decided differently. The Commonwealth defendants seek to distinguish Petty, claiming it involved three "sovereigns" and is inapposite. But if Congress can constitutionally condition a two-state gratuity for a joint agency, as the Supreme Court said it could in Petty, it surely can do so for one state and one of its agencies.

It is clear that Congress's decision to disburse federal funds may be coupled with preconditions of acceptance. In MCI Telecommunications Corp. v. Bell Atlantic-Pennsylvania, 271 F.3d 491 (2001), we said, "[B]oth the grant of consent to form an interstate compact and the disbursement of federal monies are congressionally bestowed gifts or gratuities, which Congress is under no obligation to make, which a state is not otherwise entitled to receive, and to which Congress can attach whatever conditions it chooses." Id. at 505. We also noted that in Commerce Clause cases, "the authority to regulate local telecommunications is a gratuity to which Congress may attach conditions, including a waiver of immunity to suit in federal court. Thus, the submission to suit in federal court . . . is valid as a waiver, conditioned on the acceptance of a gratuity or gift, as permitted by College Savings." Id. at 509. On balance, we believe Petty and MCI Telecommunications support our conclusion.

19

general welfare; (2) impose unambiguous conditions on states, so they can exercise choices knowingly and with awareness of the consequences; (3) impose conditions related to federal interests in the program; and (4) not induce unconstitutional action. Dole, 483 U.S. at 207-08, 210.

The District Court found no "connection between" Rehabilitation Act funds received by the Department of Corrections and Koslow's discrimination claim.16 On appeal, the Commonwealth defendants contend an Eleventh Amendment waiver must be specifically "tailored" to a particular federal interest. Because Koslow has purportedly failed to demonstrate a federal interest in SCAAP funds received by the Pennsylvania Department of Corrections, the Commonwealth defendants contend S 504 is demonstrably unconstitutional under the Spending Clause. Cf. Jim C., 235 F.3d at 1084 (Bowman, J., dissenting) (quotation and citation omitted).

We disagree. The Supreme Court in Dole declined to "define the outer parameters of the 'germaneness' or 'relatedness' limitation on the imposition of conditions under the spending power." 483 U.S. at 208 n.3. Therefore, one need only identify a discernible relationship imposed by a Rehabilitation Act condition on a "department or agency" and a federal interest in a program it funds. Through the Rehabilitation Act, Congress has expressed a clear interest in eliminating disability-based discrimination in state departments or agencies. Alexander v. Choate, 469 U.S. 287, 295-97 (1985). That interest, which is undeniably significant and clearly reflected in the legislative history, flows with every dollar spent by a department or agency receiving federal funds. The waiver of the Commonwealth's immunity from Rehabilitation Act claims by Department of Corrections employees furthers that interest directly.

Moreover, S 504 governs only a "program or activity" receiving federal funds. To put it another way, the waiver of immunity conditioned on receipt of Rehabilitation Act funds applies on an agency-by-agency, or a department-by-

20

department, basis. 29 U.S.C. S 794(b).17 This limitation helps ensure the waiver accords with the "relatedness" requirement articulated in Dole. The Commonwealth defendants accepted funds under SCAAP. Rehabilitation Act funds received by specific departments or agencies are not tracked. For our purposes, all funds received by the Department of Corrections under the Rehabilitation Act are fungible. It is virtually impossible to determine whether federal dollars paid for Koslow's salary or any benefits he received. Cf. Hoxworth v. Blinder, Robinson & Co., Inc., 903 F.2d 186, 195 (3d Cir. 1990) ("Legally as well as economically, money is fungible.").

Both Title VI and Title IX, which have been upheld as valid Spending Clause legislation, prohibit race and sex discrimination by "programs" receiving federal funds. E.g., Grove City Coll. v. Bell, 465 U.S. 555, 571 n.21 (1984) (finding employees who work in an education program receiving federal assistance are protected under Title IX "even if their salaries are not funded by federal money" (quotations and citations omitted)); Lau v. Nichols, 414 U.S. 563, 569 (1974) ("The Federal Government has power to fix the terms on which its money allotments to the States shall be disbursed. Whatever may be the limits of that power, they have not been reached here.") (citations omitted) (Title VI).18 Similarly, the conditions imposed on the Commonwealth defendants for accepting funds under SCAAP do not abridge the Spending Clause.

For these reasons, Koslow's Rehabilitation Act claim against the Pennsylvania Department of Corrections is not constitutionally barred.

17. The legislative history accompanying the bill indicates, by way of example: "If federal health assistance is extended to a part of a state health department, the entire health department would be covered in all of its operations." S. Rep. No. 64, 100th Cong., 2d Sess. 16 (1987).

18. See also Barnes v. Gorman, ___ U.S. ___, 122 S. Ct. 2097, 2100 (2002) ("Thus, the remedies for violations ofS 202 of the ADA and S 504 of the Rehabilitation Act are coextensive with the remedies available in a private cause of action brought under Title VI of the Civil Rights Act of 1964 . . . .").

21

V.

We now turn to Koslow's claims under the ADA for prospective relief against SCI-Graterford Superintendent Vaughn.19 The District Court found Koslow could not bring

these claims against Vaughn in either his individual or his official capacity because the ADA does not contemplate such "individual, or supervisor, liability." Op. at 3. Before reaching this conclusion, however, the District Court cited a footnote from Garrett, in which the Supreme Court said:

> Our holding here that Congress did not validly abrogate the States' sovereign immunity from suit by private individuals for money damages under Title I does not mean that persons with disabilities have no federal recourse against discrimination. Title I of the ADA still prescribes standards applicable to the States. Those standards can be enforced by the United States in actions for money damages, as well as by private individuals in actions for injunctive relief under Ex parte Young, 203 U.S. 123 (1908).20

536 U.S. at 374 n.9. The District Court then concluded, "More significant is the fact that even were I to read the Second Amended Complaint to plead an ADA claim explicitly against Superintendent Vaughn, there is no individual, or supervisor, liability under the ADA." Op. at 3. We will first consider the statutory issue before turning to the constitutional argument. We exercise plenary review over both.

---

19. As noted, after Garrett (which barred claims under Title I of the ADA against states) and the District Court's dismissal of Koslow's Title II claims (which is not appealed), this claim for prospective injunctive relief against Vaughn is Koslow's only remaining ADA claim.

20. In Ex parte Young, the Supreme Court found a state official acting in violation of the Constitution or federal law acts ultra vires and is no longer entitled to the state's immunity from suit. The "Young fiction" allows courts to avoid entering judgments directly against the state while permitting individual actions against officials violating federal law.

22

A.

Title I of the ADA, incorporating the enforcement scheme of the Civil Rights Act of 1964, authorizes private injunctive suits against a "respondent," defined by statute to include an "employer." 42 U.S.C. SS 2000e(n), 2000e-5(f)-(g). The District Court's analysis focused on whether there is "individual" or "supervisor" liability under the statute. But both Title I and Title VII define "employer" to include persons "engaged in an industry affecting commerce who has 15 or more employees . . . and any agent of such person." 42 U.S.C. SS 2000e(b), 12111(5)(A). State governments can constitute "employers" under the statute.21 As the Supreme Court held in Garrett:

> [Title I of] [t]he ADA prohibits certain employers, including the States, from 'discriminat[ing] against a qualified individual with a disability because of the disability in regard to job application procedures, the

> hiring, advancement, or discharge of employees,
> employee compensation, job training, and other terms
> conditions, and privileges of employment.

531 U.S. at 360-61 (citations omitted). And for the same
reasons that we have allowed Title VII claims to proceed
against public officials in their official capacities, an official
sued in his official capacity is an "agent" of the state

_____

21. 42 U.S.C. S 2000e(b) provides:

> The term "employer" means a person engaged in an industry
> affecting commerce who has fifteen or more employees for each
> working day in each of twenty or more calendar weeks in the
> current or preceding calendar year, and any agent of such a person,
> but such term does not include (1) the United States, a corporation
> wholly owned by the Government of the United States, an Indian
> tribe, or any department or agency of the District of Columbia
> subject by statute to procedures of the competitive service (as
> defined in section 2102 of Title 5), or (2) a bona fide private
> membership club (other than a labor organization) which is exempt
> from taxation under section 501(c) of Title 26, except that during the
> first year after March 24, 1972, persons having fewer than twenty-
> five employees (and their agents) shall not be considered employers.

Although the United States is excluded by this definition, state
governments are not.

23

employer under Title I of the ADA. Cf. In re Montgomery
County, 215 F.3d 367, 372-75 (3d Cir. 2000) (allowing
officials in their official capacities to be held liable under
Title VII).

While there appears to be no individual liability for
damages under Title I of the ADA, cf. EEOC v. AIC Sec.
Investigations, Ltd., 55 F.3d 1276, 1280 n.4 (7th Cir. 1995),
prospective relief against state officials acting in their
official capacities may proceed under the statute. The
complaint alleges misconduct by Vaughn only as an official
supervisor at SCI-Graterford. Therefore, under the statute,
insofar as Koslow seeks prospective injunctive relief, he
states a cognizable claim against SCI-Graterford
Superintendent Vaughn, but only in his representative --
not his individual -- capacity.

B.

The parties also dispute whether Koslow's ADA
prospective claim for injunctive relief against SCI-Graterford
Superintendent Vaughn is barred by the Eleventh
Amendment. Cf. Seminole Tribe, 517 U.S. at 73. Said
another way, the parties disagree whether the Ex parte
Young doctrine applies in the first instance. As noted, the
Eleventh Amendment bars private suits against a state
sued in its own name except in certain narrow
circumstances. Alden, 527 U.S. at 755-56. But the

Supreme Court has said, "Both prospective and retrospective relief implicate Eleventh Amendment concerns, but the availability of prospective relief of the sort awarded in Ex parte Young gives life to the Supremacy Clause. Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law." Green v. Mansour, 474 U.S. 64, 68 (1985).

The Commonwealth defendants contend the Eleventh Amendment only permits suits against officials in their individual capacities, barring suits against officials in their representative capacities absent waiver or abrogation. We disagree. The Eleventh Amendment has not been interpreted to bar a plaintiff 's ability to seek prospective

24

relief against state officials for violations of federal law. Official-capacity suits are an alternative way to plead actions against entities for which an officer is an agent. See Kentucky v. Graham, 473 U.S. 159, 167 n.14 (1985):

> Unless a State has waived its Eleventh Amendment immunity or Congress has overridden it, however, a State cannot be sued directly in its own name regardless of the relief sought. Thus, implementation of state policy or custom may be reached in federal court only because official-capacity actions for prospective relief are not treated as actions against the State.

(citations omitted); see also Verizon Md., Inc. v. Pub. Serv. Comm'n of Md., ___ U.S. ___, 122 S. Ct. 1753, 1760 (2002) ("In determining whether the doctrine of Ex parte Young avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether[the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.") (quotations and citations omitted); Seminole Tribe, 517 U.S. at 73 (Eleventh Amendment no bar to "federal jurisdiction over a suit against a state official when that suit seeks only prospective injunctive relief in order to end a continuing violation of federal law") (quotation and citation omitted).

Three other courts of appeals have allowed suits for purely injunctive relief under the ADA against state officials. See Carten v. Kent St. Univ., 282 F.3d 391, 396 (6th Cir. 2002) ("[A]n official who violates Title II of the ADA does not represent 'the state' for purposes of the Eleventh Amendment, yet he or she nevertheless may be held responsible in an official capacity for violating Title II [of the ADA], which by its terms applies only to 'public entit[ies].' "); Gibson v. Ark. Dept. of Corr., 265 F.3d 718, 720 (8th Cir. 2001) ("The Eleventh Amendment is not a bar to federal jurisdiction over a suit against a state official when that suit seeks only prospective injunctive relief in order to end a continuing violation of federal law.") (quotations and citations omitted); Roe No. 2 v. Ogden, 253 F.3d 1225, 1233-34 (10th Cir. 2001). In a different context,

we have said, "The principle which emerges from Young and its progeny is that a state official sued in his official capacity for prospective injunctive relief is a person within

section 1983, and the Eleventh Amendment does not bar such a suit." Hindes v. FDIC, 137 F.3d 148, 165 (3d Cir. 1998).

For these reasons, federal ADA claims for prospective injunctive relief against state officials are authorized by the Ex parte Young doctrine. The Court of Appeals for the Eighth Circuit's analysis in Gibson is apposite. In that case, the court found Seminole Tribe, on which the Commonwealth defendants rely, dealt with a "markedly different" statute than the ADA, the Indian Gaming Regulatory Act (IGRA). 265 F.3d at 720.22  Unlike the IGRA, the court found there were several enforcement mechanisms for plaintiffs to sue under Titles I or II of the ADA. Id. at 721 (noting all remedies of Title VII of the Civil Rights Act of 1964, including equitable orders and contempt proceedings, are applicable to ADA Title I plaintiffs). Second, unlike the IGRA, Congress "chose to use existing civil rights enforcement mechanisms" when drafting the ADA. Id. In doing so, Congress was aware that federal district courts had issued orders "compelling state officials to perform their statutory obligations." Id. at 722. Third, the court noted, a single state official can enforce an ADA provision, while complying with the IGRA requires cooperative efforts by state negotiators and ratification by the state legislature. Id. Considering all of these factors, the court held, "the ADA is a more suitable candidate than IGRA for Ex parte Young suits designed to change the behavior of specific government officials."  Id.

_____

22. In Seminole Tribe, an Indian tribe sued the governor of Florida under the IGRA. The Supreme Court held Ex parte Young  did not apply to the tribe's suit against the governor because Congress did not intend to authorize federal jurisdiction under Ex parte Young to enforce the IGRA. Seminole Tribe, 517 U.S. at 75 n.17, 76. The IGRA allows tribes to sue states in federal district court if a state does not negotiate regarding certain gaming rights, but remedial authority is minimal. The Supreme Court dismissed the tribe's IGRA claim, holding,"[W]here Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon Ex parte Young." Id. at 74. The Court said allowing actions against an official under Ex parte Young would expand remedial powers beyond what Congress intended. Id. at 75.

When the relief sought is prospective injunctive relief, the request "is ordinarily sufficient to invoke the Young fiction." Idaho v. Coeur d'Alene Tribe, 521 U.S. 261, 281 (1997). Koslow's claim for reinstatement, with accommodations for

his disability, is the type of injunctive, "forward-looking" relief cognizable under Ex parte Young. Therefore, he can state federal claims under the ADA against Superintendent Vaughn, acting in his official capacity, for prospective injunctive relief.

VI.

Next, we consider whether the District Court properly granted summary judgment to PHICO and CompServices on Koslow's claims under the ADA and the Rehabilitation Act. The District Court found these workers' compensation providers had no decisionmaking authority over Koslow's employment:

> They did not fire plaintiff or refuse him an accommodation. PHICO ceased to be involved in any way after December 1997, and it is not at all clear that plaintiff is complaining about anything that occurred during PHICO's tenure. The only act attributable to CompServices is its referral of plaintiff to an independent medical examination . . . . [I]t is ludicrous to suppose that by furnishing to the Commonwealth defendants the information that plaintiff was fit to return to work, CompServices was discriminating against him . . . .

Op. at 7. We review the grant of summary judgment de novo. Doe, 242 F.3d at 446.23

A.

From 1990 to 1997, under agreements with the Commonwealth of Pennsylvania, PHICO was the third-party

---

23. The District Court found CompServices and PHICO, agents of their employer, could be liable even when the principal was immune from liability. Therefore, the Court found CompServices and PHICO could be covered entities under the ADA.

27

administrator for some portions of the Commonwealth's self-insured workers' compensation plans. PHICO maintains that these services were primarily ministerial, such as forwarding information received from health care providers to the Department of Corrections, calculating sums correctional facilities owed in benefits, and the like. For these services, PHICO was paid a flat rate.

PHICO's Vice President of Claims Operations testified the company's compensation contracts applied only to PHICO employees, not to Commonwealth employees. Koslow contends a jury was entitled to test the credibility of this statement, rendering summary judgment inappropriate. Moreover, Koslow suggests genuine issues of material fact remain whether PHICO's "nonfeasance" on his claim contributed to a "breakdown in the interactive process"

between Koslow and SCI-Graterford, which itself might constitute a violation of the ADA.

We disagree. The District Court correctly concluded PHICO had no responsibility for ensuring SCI-Graterford's compliance with the ADA and the Rehabilitation Act. Only SCI-Graterford administrators, not PHICO administrators, could determine whether Koslow, if "disabled," could be accommodated. No material issues of fact remain unresolved on PHICO's "decisionmaking" authority over Koslow.

Additionally, although the District Court did not address this issue directly, we do not believe that under these facts, PHICO is a "covered entity" under the ADA. Only "covered entities," as defined in 42 U.S.C. S 12112(a), may be liable under the statute. Here, PHICO could be a proper defendant only as the "agent" of Koslow's employer. Id. S 12112(2). But in Krouse v. American Sterilizer Co., 126 F.3d 494 (3d Cir. 1997), we rejected an agency theory similar to Koslow's, holding that in the absence of evidence that a third-party workers' compensation administrator had harassed plaintiff at the direction of plaintiff 's employer, the administrator was "not an agent" of the employer and therefore was "not a covered entity under the ADA." Id. at 505. As in Krouse, Koslow cannot demonstrate PHICO acted at the direction of the Pennsylvania Department of Corrections in "wrongly" denying his claim.

28

B.

On December 29, 1997, CompServices began providing third-party workers' compensation administration services for claims against SCI-Graterford accruing prior to July 1997. Koslow contends CompServices, like PHICO, had contractual and statutory duties -- albeit "implicit" ones -- not to discriminate against SCI-Graterford employees. Similar to his previous argument, Koslow contends there is an issue of fact whether CompServices's obligations to comply with Title II of the ADA extended to the employees of SCI-Graterford.

We disagree. CompServices, which assumed responsibilities for the SCI-Graterford account in December 1997, had, at most, only a minimal connection with Koslow's claim. Like PHICO, CompServices had no decisionmaking authority over Koslow and had no role in the alleged discrimination. For the reasons noted, CompServices is not a "covered entity" for ADA purposes.

The District Court correctly disposed of Koslow's ADA claims against PHICO and CompServices.

VII.

Finally, we consider the dismissal of Koslow's state law claims against PHICO and CompServices. The District

Court concluded these PHRA claims were not cognizable because the statute does not define "employer" to include an "agent" thereof:

> The PHRA applies to "any employer[,]" but unlike the ADA does not contain a reference to an "agent" thereof. Since the PHRA does not define "employer," courts look to the common law indicia of a master-servant relationship . . . . The employer's power to control the nature and parameters of the employee's activities is the key to the relationship. . . . I reject out of hand plaintiff 's contention that the Supremacy Clause requires the term "employer" as it is used in the PHRA not to be interpreted any more narrowly than it is defined in the ADA or Title VII.

We exercise plenary review over this question of law.

29

The PHRA defines "person" as "includ[ing] one or more individuals, partnerships, associations, organizations, corporations . . . [and] . . . any . . . agent. . . thereof." 43 P.S. S 954(a). Koslow contends the PHRA defines "person" to include an "agent," so PHICO and CompServices, as "alleged agents" of the Department of Corrections, can be liable. We disagree. No Pennsylvania authority supports Koslow's interpretation of the PHRA. In Dici v. Pennsylvania, 91 F.3d 542, 552 (3d Cir. 1996), we said, "The employment discrimination provision of the PHRA declares only that 'any employer' may be liable." We have never said "any person" can be liable under the statute. See also Van Horn v. Elbeco Inc., No. 94-2720, 1996 WL 385630, at *4 n.18 (E.D. Pa. July 10, 1996) ("[T]he PHRA has no . . . reference to agents of [an] employer in its definition of 'employer.' "). Additionally, under the PHRA, the "person" must "employ four or more persons," arguably expressing the intent that only employers be held liable. The District Court properly disposed of Koslow's state law claims.

VIII.

For these reasons we will reverse in part and affirm in part. We will reverse the judgment of the District Court holding the Commonwealth had not waived sovereign immunity to Rehabilitation Act claims. We also will reverse the judgment of the District Court denying Koslow's ADA claim for prospective injunctive relief against SCI-Graterford Superintendent Vaughn, acting in his official capacity. In all other respects, we will affirm the judgment of the District Court. We will remand for further proceedings consistent with this opinion.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit