

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-16-2003

# M.A. v. Newark Pub Sch

Precedential or Non-Precedential: Precedential

Docket No. 02-1799

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"M.A. v. Newark Pub Sch" (2003). *2003 Decisions*. Paper 232.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/232

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed September 16, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 02-1799

_____

M.A., on behalf of E.S., M.A., A.T. on behalf of G.T., A.T.,
G.L. on behalf A.O., G.L., H.M. on behalf M.M., H.M.,
O.J. on behalf of O.D.J., O.J., A.E. on behalf of A.J.E.
and A.E., individually and on behalf of all others similarly
situated,

Appellees,

v.

STATE-OPERATED SCHOOL DISTRICT OF THE CITY OF
NEWARK; NEW JERSEY DEPARTMENT OF EDUCATION;
VITO A. GAGLIARDI, SR., in his individual capacity;
WILLIAM L. LIBRERA, Commissioner, New Jersey
Department of Education, in his official capacity;
BARBARA GANTWERK, Director, Office of Special
Education Programs, New Jersey Department of
Education, in her official and individual capacities;
MELINDA ZANGRILLO, Coordinator of Compliance, Office
of Special Education Programs, New Jersey Department of
Education, in her official and individual capacities,

Appellants,

UNITED STATES OF AMERICA (Intervenor in D.C.).

_____

On Appeal from the United States District Court
for the District of New Jersey

District Court Judge: The Honorable Katherine S. Hayden
(01-CV-3389)

_____

Argued on October 31, 2002

Before: SLOVITER, FUENTES, *Circuit Judges*,
and FULLAM,* *District Judge*

(Opinion Filed: September 16, 2003)

———————

Peter C. Harvey
Attorney General of New Jersey
Patrick DeAlmeida (argued)
Michael Lombardi
Todd Schwartz
Deputy Attorneys General
R.J. Hughes Justice Complex
P.O. Box 112
Trenton, NJ 08625

*Attorneys for Appellants*

Ruth Deale Lowenkron (argued)
Jennifer Weiser
Education Law Center
60 Park Place
Suite 300
Newark, NJ 07102

Lawrence Lustberg
Shavar D. Jeffries
Gibbons, Del Deo, Dolan, Griffinger
& Vecchione
One Riverfront Plaza
Newark, NJ 07102

*Attorneys for Appellees*

---

* The Honorable John P. Fullam, United States District Court for the Eastern District of Pennsylvania, sitting by designation.

Sarah E. Harrington
Kevin Russell (argued)
Civil Rights Division
United States Department of Justice
950 Pennsylvania Avenue
Washington, DC 20530

*Attorneys for Intervenor*

---

**OPINION OF THE COURT**

---

FUENTES, *Circuit Judge*:

The present appeal is the latest chapter in the longstanding feud between citizens, public interest groups, municipal officials, and state agencies over the provision of public education in the City of Newark. In an earlier chapter, the New Jersey Department of Education ("NJDOE") determined that the Newark Board of Education had failed to provide a thorough and efficient system of education and invoked its statutory powers[1] to establish the State-Operated School District of the City of Newark ("SOSD" or "Newark") in July 1995. *See generally Gonzalez v. State-Operated School District of the City of Newark*, 784 A.2d 101, 102 (N.J. Super. Ct. App. Div. 2001).

Plaintiffs commenced this action on behalf of six minors attending public schools in Newark and on behalf of all others similarly situated (collectively, "Plaintiffs"), against the SOSD, NJDOE, and several state officials (collectively, "Defendants").[2] They alleged violations of (a) the Individuals

---

1. N.J.S.A. §§ 18A:7A-34 to -52.

2. The state officials include Vito A. Gagliardi ("Gagliardi"), former Commissioner of the NJDOE; Barbara Gantwerk ("Gantwerk"), Director of the Office of Special Education Programs of the NJDOE; and Melinda Zangrillo ("Zangrillo"), Coordinator of Compliance in the Office of Special Education Programs. On August 19, 2002, the Clerk of Court granted Plaintiffs' motion to amend the caption to include the current Commissioner of the NJDOE, William Librera and to retain Vito A. Gagliardi as a defendant in his individual capacity only.

When appropriate, we refer to the NJDOE and the state officials collectively as the "State."

with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-87; (b) 42 U.S.C. § 1983, based on the claimed violations of the IDEA; and (c) the New Jersey Constitution and relevant state laws. After the District Court denied their motions to dismiss, Defendants appealed. The principal issue on appeal is whether the state of New Jersey waived its sovereign immunity from suit in federal court when it accepted funds disbursed pursuant to the IDEA. Insofar as the District Court held that the state had waived its sovereign immunity, we will affirm.[3]

## I. BACKGROUND

### A. The Statutory Framework of the IDEA

The IDEA is a comprehensive scheme of federal legislation designed to meet the special educational needs of children with disabilities. *See Dellmuth v. Muth*, 491 U.S. 223, 225 (1989). The legislation was enacted in part based on Congress's findings that, prior to 1975,[4] "the special educational needs of children with disabilities were not being fully met," and that "more than one-half of the children with disabilities in the United States did not receive appropriate educational services that would enable such children to have full equality of opportunity." 20 U.S.C. § 1400(c)(2)(A) and (2)(B).

In light of its findings, Congress made federal funds available to assist states in providing educational services to children with disabilities. *See* 20 U.S.C. §§ 1411, 1412(a). Under the IDEA, assistance is available on the condition that states meet a number of substantive and procedural criteria. *See* 20 U.S.C. § 1412(a)(1)-(a)(22); *W.B. v. Matula*, 67 F.3d 484, 491 (3d Cir. 1995). The cornerstone of

---

3. We note that another panel of this Court has recently reached the same conclusion. *See A.W. v. The Jersey City Public Schools*, No. 02-2056, 2003 WL 21962952 (3d Cir. Aug. 19, 2003).

4. The IDEA was originally enacted in 1970 as the Education of the Handicapped Act ("EHA"), Pub. L. No. 91-230, 84 Stat. 175, §§ 601-662, as amended 20 U.S.C. § 1400-87. *See Honig v. Doe*, 484 U.S. 305, 309 (1988); *Beth V. v. Carroll*, 87 F.3d 80, 82 (3d Cir. 1996).

eligibility for federal funds under the IDEA is the substantive right of disabled children to a "free appropriate public education." 20 U.S.C. § 1412(a)(1); *see Honig v. Doe*, 484 U.S. 305, 308-10 (1988); *Beth V. v. Carroll*, 87 F.3d 80, 82 (3d Cir. 1996). As we noted in *Matula*, a free appropriate education " 'consists of educational instruction specifically designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child "to benefit" from the instruction.' " 67 F.3d at 491 (citing *Board of Education v. Rowley*, 458 U.S. 176, 188-89 (1982)).

In addition to the condition of ensuring free, appropriate public education, the IDEA requires states to guarantee certain procedural rights in order to qualify for funding. Many of these procedural mechanisms have been implemented in the laws and regulations of New Jersey. *See id.* at 492 ("New Jersey fulfills its obligations [under the IDEA] through a complex statutory and regulatory scheme . . . ."). Several of the procedural rights bear upon the Plaintiffs' allegations here.

First, a state must demonstrate that it has a system in place to identify, locate, and evaluate all children with disabilities residing in the state. *See* 20 U.S.C. § 1412(a)(3);[5] *see also Matula*, 67 F.3d at 492; N.J.A.C. § 6A:14-3.1(a). This obligation is commonly referred to as the "child find" duty. *Matula*, 67 F.3d at 492. In New Jersey, if a parent requests an evaluation for his or her child, the request shall immediately be considered a referral to a Child Study Team ("CST") to determine if the child should be classified as disabled. *See* N.J.A.C. § 6A:14-3.3(d)(2).

Second, after identifying and evaluating children with disabilities, a state must develop and implement Individual Education Programs ("IEP") for all children classified as disabled. *See* 20 U.S.C. §§ 1412(a)(4), 1414(d); *see also* 34 C.F.R. § 300.128(a); N.J.A.C. § 6A:14-3.1(a); *Matula*, 67

---

5. Specifically, § 1412(a)(3) requires states to ensure that "All children with disabilities residing in the State . . . are identified, located, and evaluated and a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services."

F.3d at 492 ("The primary mechanism for delivering a free appropriate education is the development of a detailed instruction plan, known as an Individual Education Program . . . ."). Each IEP must take the form of a written statement setting forth, among other things, the effect of a child's disability, measurable goals and benchmarks, the special educational services to be provided to the child, and the child's progress under the IEP. *See* 20 U.S.C. § 1414(d)(1)(A).

Both the IDEA and, in greater detail, the implementing laws of New Jersey delineate timetables for meeting various IDEA obligations. For instance, if a student is referred for an evaluation, the CST, including the child's teacher, must convene a meeting with the child's parents within 20 days. *See* N.J.A.C. § 6A:14-3.3(e). A decision based on the evaluation should be made within 15 days of the meeting. *See* N.J.A.C. § 6A:14-2.3(e) and (f). If a child is determined to be disabled, the CST must convene a meeting to develop an IEP within 30 days. *See* 34 C.F.R. § 300.343(b)(2). From start to finish, the laws of New Jersey require implementation of an IEP for a disabled child within 90 days of initial evaluation. *See* N.J.A.C. § 6A:14-3.4(c).

Third, the IDEA affords parents a number of other procedural safeguards. Parents have the right to (1) examine all records and participate in all meetings with respect to the identification, evaluation, and educational placement of their child, 20 U.S.C. § 1415(b)(1); (2) receive written notice whenever a school proposes to change or refuses to change an identification, evaluation, or educational placement of their child, § 1415(b)(3); and (3) participate in mediation to resolve any disputes arising under the IDEA, § 1415(b)(5). *See also Matula*, 67 F.3d at 492.

Fourth, the IDEA requires states to provide "an opportunity to present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6); *see also Beth V.*, 87 F.3d at 82. The complaint procedure must also provide parents an impartial due process hearing to be conducted by the state or local

educational agency in accordance with the state's laws. *See* 20 U.S.C. § 1415(f); *see also Beth V.*, 67 F.3d at 82. Any party aggrieved by the findings and decision of the due process hearing has the right to appeal to either state court or federal court. *See* 20 U.S.C. § 1415(i)(2); *see also Beth V.*, 67 F.3d at 82.

As the text of the IDEA suggests, state agencies and local educational agencies, or school boards, share the responsibility for complying with the requirements of the Act. Naturally, when decisions concerning the educational services of an individual child are at issue, the duties will tend to shift from those removed from the situation to the local educational agencies with greater access and knowledge. New Jersey's statutory scheme for implementing the IDEA recognizes these shared duties. *See* N.J.A.C. § 6A:14-3.1(a) and (b) (school districts responsible for the development and review of IEPs, as well as the placement of children with disabilities). Nevertheless, as Plaintiffs allege, the participating state retains primary responsibility for ensuring compliance with the IDEA and for administering educational programs for disabled children. *See* 20 U.S.C. § 1412(a)(11)(A); *Kruelle v. New Castle County School District*, 642 F.2d 687, 696 (3d Cir. 1981).

Because the IDEA offers conditional federal funds for state educational programs with full recognition of the importance of state laws and local educational agencies, courts have described the Act as a model of "cooperative federalism." *Beth V.*, 87 F.3d at 82 (citations omitted).

## B. Factual Background

We turn to the specific factual allegations in the present case. At this point in the litigation, we accept all well-pleaded allegations in the Complaint as true and draw all reasonable inferences in favor of the non-moving parties. *Board of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 168 (3d Cir. 2002). Plaintiffs are the parents of six minors who attended schools in Newark. Based on their experiences, the children may be grouped into two categories: (1) E.S., G.T., A.O., and M.M. are allegedly disabled children who, despite repeated

requests by their parents, never received an evaluation to determine eligibility for special education services, or never benefitted from the implementation of IEPs; and (2) O.D.J. and A.J.E. were evaluated as disabled children and began receiving special education services, but only after years of neglect by local educational agencies and the state.

E.S. entered Newark's public schools in September 1997 as a kindergartner. For several years, E.S. either failed or marginally passed most classes, but nevertheless advanced to the next grade level each year. Sometime during the 1999-2000 school year, E.S.'s mother requested help. As instructed by the School Principal, E.S.'s mother asked for an evaluation. Despite three separate follow-up requests, no evaluation was ever scheduled for E.S. School officials told E.S.'s mother that Newark lacked the resources to evaluate every potentially disabled child and that it would be a "waste of time" to continue sending E.S. to school. Compl. at ¶ 108.

G.T.'s mother initially requested an evaluation in September 2000, as a result of G.T.'s poor academic performance. School officials never responded. In 2001, a private physician diagnosed G.T. with Attention Deficit Hyperactive Disorder ("ADHD") and Myasthenia Gravis. *Id.* at ¶¶ 112-13. At the time, G.T. was in the third grade at a Newark public school. G.T.'s mother requested evaluations again on two separate occasions. Finally, school officials attempted to schedule an initial meeting to determine whether an evaluation was necessary, but postponed on numerous occasions. Despite G.T.'s diagnosed disabilities, "[a]fter five scheduled meetings to determine whether an evaluation was warranted, Newark has yet to decide whether an evaluation is warranted." *Id.* at ¶ 125.

A.O. was diagnosed with Attention Deficit Disorder ("ADD") and has been taking Ritalin for his ADD since the age of seven. Because of poor academic performance and behavioral problems, A.O. attended three different schools in three years. After numerous requests and three separate diagnoses by private physicians of possible "neuro-based learning disabilities" and ADD, A.O. finally received a CST evaluation on May 23, 2001. *Id.* at ¶ 133. Although the CST determined that A.O. had a "specific learning disability" and

developed an IEP for him, the IEP was never implemented. *Id.* at ¶¶ 161-62. "Given the four years during which Defendants failed to address A.O.'s educational needs, [A.O.'s mother] remains extremely skeptical of whether or not Defendants will provide her son with the necessary services in the 2001-2002 school year." *Id.* at ¶ 163.

M.M.'s mother first requested an evaluation for her son in March 1999. After that request went unheeded, M.M.'s mother went to a private physician, who diagnosed M.M. with ADHD and prescribed Ritalin. Because of his hyperactivity and impulsive behavior, the physician recommended that M.M. be placed in a small classroom setting. M.M.'s mother again requested an evaluation at the start of the 1999-2000 school year. After several months, school officials merely suggested intervention strategies. The entire school year passed without an evaluation by the CST. Although an eligibility evaluation finally took place in February 2001, "Newark conducted an incomplete evaluation. Moreover, Defendants have yet to provide M.M. with special education and related services, and Defendants have not mentioned their obligation to provide M.M. with 'compensatory education.'" *Id.* at ¶ 187.

The experiences of O.D.J. and A.J.E. differ from those of the first four children in that they were classified as disabled and ultimately began receiving special education services after repeated requests from parents and intervention by their families' lawyers. However, neither O.D.J. nor A.J.E. have received the compensatory education for the time during which they were deprived of appropriate education. Both of them failed to receive special education services for approximately two years before school officials implemented their IEPs.

Based on similar anecdotal evidence, Plaintiffs' attorneys at the Education Law Center ("ELC") filed a complaint investigation request with the NJDOE on July 24, 1998.[6] Although some of the parents identified in the complaint had earlier requested due process hearings in accordance

---

6. From the record it appears that the only child mentioned in the present action who was also named in the July 24, 1998 complaint investigation request is O.D.J. *See* App. at 84-85.

with the IDEA and state statutes, others had not. The ELC requested a formal investigation into Newark's failure to identify and evaluate children with potential disabilities in both public and private schools and to conduct disability evaluations in a timely manner. *Id.* at ¶ 72.

ELC's complaint resulted in two reports from the office of the NJDOE. The first Complaint Investigation Report was dated December 28, 1998, signed by Director Gantwerk, and transmitted by Zangrillo. Notably, the NJDOE found that Newark had " 'failed to develop an efficient procedure to address the inordinately large number of incomplete, noncompliant initial cases.' " *Id.* at ¶ 77. Furthermore, the NJDOE acknowledged that "Newark was engaged in 'systemic noncompliance with the requirements established in N.J.A.C. 6[A]:28 and N.J.A.C. 6A:14 regarding the identification and evaluation of potentially disabled pupils residing in the city of Newark.' " *Id.* at ¶ 83. The state recommended systemic corrective action. *Id.*

The NJDOE subsequently issued a Report of Findings on September 6, 2000, based on information gathered during a visit to Newark between May 8 and May 15, 2000. In the September Report, the NJDOE observed that Newark continued to suffer from a lack of and ineffective deployment of staff, which were continuing to impact Newark's ability to adhere to statutory deadlines. Therefore, the State ordered an improvement plan to be implemented as soon as possible.

Despite the assurances in these reports about systemic corrective action and improvement plans, Plaintiffs contend that none of the students named in the July 24, 1998 complaint, and none of the children identified in the present Complaint, received the compensatory education to which they are entitled.

## C. Procedural History

On the basis of these allegations, Plaintiffs filed a Complaint in District Court asserting twelve causes of action. The first eight allege violations of the IDEA against all Defendants. The ninth and tenth causes of action assert violations of Plaintiffs' civil rights pursuant to 42 U.S.C.

§ 1983 for noncompliance with the IDEA. These claims are asserted against all Defendants and the NJDOE, respectively. The eleventh and twelfth causes of action allege violations of the New Jersey state constitution and of the "*Abbott v. Burke*" mandates.[7] These claims are brought against Newark and the NJDOE, respectively. Plaintiffs also requested entry of a permanent injunction ordering Defendants to abide by their obligations under the IDEA and relevant New Jersey state law. Because of the widespread systemic failures at the local and state levels detailed in the Complaint, Plaintiffs brought suit on behalf of all others similarly situated to the six named children.

Pursuant to Rules 12(b)(1) and (b)(6) of the Federal Rules of Civil Procedure, the NJDOE and the State officials moved to dismiss the Complaint. Defendants advanced numerous grounds for dismissal. First, the State argued that the NJDOE and the named officials were immune from suit under the IDEA pursuant to the Eleventh Amendment. Second, it contended that Plaintiffs' IDEA and § 1983 causes of action should be dismissed for their failure to exhaust administrative remedies as required by 20 U.S.C. § 1415(*l*).[8] Third, the state argues that, based on the State's sovereign immunity, entry of injunctive relief was improper against it and that it was not the proper subject of an order directing the provision of free, appropriate public education. Fourth, as to the state law claims, the District Court should abstain from asserting jurisdiction over them because of the State's sovereign immunity.

---

7. The *Abbott v. Burke* mandates were set forth in a line of cases before the Supreme Court of New Jersey. *See, e.g., Abbott ex rel. Abbott v. Burke*, 575 A.2d 359 (N.J. 1990); *Abbott ex rel. Abbott v. Burke*, 710 A.2d 450 (N.J. 1998); *Abbott ex rel. Abbott v. Burke*, 751 A.2d 1032 (N.J. 2000).

8. Newark also moved to dismiss the Complaint on various grounds. *See* App. at 6-7. Newark is not a party to this appeal as it did not file a notice of appeal. Nevertheless, it filed a supporting brief urging dismissal of the Complaint on the exhaustion grounds advanced by the state. In an Order dated October 29, 2002, we granted Plaintiffs' motion to strike Newark's brief. In any event, Newark's contentions are addressed in connection with our discussion of the State's exhaustion arguments.

The District Court denied the motions to dismiss in their entirety. The Court held that Congress validly abrogated the states' sovereign immunity in enacting the IDEA and that, in any event, New Jersey had waived its Eleventh Amendment immunity by accepting IDEA funds. Second, the Court found the State's exhaustion arguments unavailing because Plaintiffs had alleged a widespread systemic breakdown of the provision of free, appropriate public education, a claim which could not be addressed sufficiently in administrative proceedings. Third, the Court entered a preliminary injunction against all Defendants in a separate order, reasoning that immunity was not available to the State and that the State was a proper party to the order. Fourth, having retained the federal claims, the Court exercised its supplemental jurisdiction over the State law claims in the Complaint.

The State's appeal followed.

## II.  Jurisdiction

The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, 1367, and the relevant provision of the IDEA granting subject matter jurisdiction over claims arising under the Act to the federal courts. *See* 20 U.S.C. § 1415(i)(3)(A).

Because the State reasserts nearly the full panoply of defenses that it argued before the District Court, our jurisdiction over this appeal requires some clarification. We first consider whether we have jurisdiction over the District Court's rulings. 28 U.S.C. § 1291 limits our jurisdiction to final judgments. *See We Inc. v. City of Philadelphia*, 174 F.3d 322, 324 (3d Cir. 1999). A final judgment is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Cunningham v. Hamilton County, Ohio*, 527 U.S. 198, 204 (1999) (citations omitted). The final judgment rule calls into question several claims made by the State on appeal.

The denial of a motion to dismiss on the grounds of failure to exhaust administrative remedies is not, by any definition, a final judgment that ends the litigation on the merits. The District Court's decision merely indicates that

a decision on the merits of the IDEA and § 1983 claims lies ahead. The notion that a denial of a motion to dismiss for failure to exhaust is not a final judgment is "[s]o clear . . . that, until now, no court of appeals has been required to deal in a published opinion with a contention that rejection of an exhaustion argument is immediately appealable." *Davis v. Streekstra*, 227 F.3d 759, 762 (7th Cir. 2000). In a similar situation, we held that a district court's denial of a motion to dismiss for failure to submit to an informal dispute resolution procedure was not immediately appealable. *See Harrison v. Nissan Motor Corp. in U.S.A.*, 111 F.3d 343, 352 (3d Cir. 1997). While we tend to agree with the State that the issue of exhaustion is important, we cannot conclude that the District Court's decision was conclusive or that the exhaustion issue will be unreviewable on appeal after a decision on the merits. For these reasons, we lack jurisdiction to review the State's exhaustion arguments at this stage of the litigation.

The District Court's decision to exercise supplemental jurisdiction over the claims under New Jersey state law is also not final. While we have said that a discretionary remand that takes place pursuant to 28 U.S.C. § 1367(c) may constitute a final judgment, *see In re U.S. Healthcare, Inc.*, 193 F.3d 151, 159 (3d Cir. 1999), *cert. denied*, 530 U.S. 1242 (2000), that situation is the exact opposite of the one present here, where the District Court has *retained* its supplemental jurisdiction over the two state law causes of action. Again, a final decision on the merits lies ahead, and we lack jurisdiction to review this aspect of the District Court's judgment.[9]

Pursuant to the collateral order doctrine, however, we have jurisdiction to review the state's claim of Eleventh Amendment immunity. *See Puerto Rico Aqueduct & Sewer Authority v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 147 (1993) ("We hold that States and state entities that claim to be

---

9. The State reasserted the sovereign immunity argument in their motion to dismiss the § 1983 and state law claims. Our analysis of the Eleventh Amendment issue in Part III.A, *infra*, controls with respect to the State's objections to all three sets of Plaintiffs' claims under the IDEA, § 1983, and state law.

'arms of the State' may take advantage of the collateral order doctrine to appeal a district court order denying a claim of Eleventh Amendment immunity."). Because the protection of the Eleventh Amendment is akin to absolute immunity from suit, rather than an affirmative defense, that protection is lost if the suit is permitted to proceed without an appeal. *See id.* at 144.

As to the entry of injunctive relief, we have jurisdiction pursuant to 28 U.S.C. 1292(a)(1) over the state's interlocutory appeal. Therefore, our analysis below is confined to these two aspects of the District Court's judgment.

Our review of the denial of sovereign immunity is plenary, and we review the entry of injunctive relief for abuse of discretion. *See Lavia v. Pennsylvania Department of Corrections*, 224 F.3d 190, 194 (3d Cir. 2000); *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co.*, 290 F.3d 578, 586 (3d Cir. 2002).

## III.  ANALYSIS

### A.  Eleventh Amendment Immunity

The Eleventh Amendment to the United States Constitution provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. CONST. amend. XI. While the text of the Eleventh Amendment refers only to suits against states brought by citizens of another state or a foreign state, *see Koslow v. Commonwealth of Pennsylvania*, 302 F.3d 161, 167 (3d Cir. 2002), *cert. denied*, 123 S. Ct. 1353 (2003), the Supreme Court has consistently reaffirmed the fundamental constitutional protections embodied in state sovereignty. *See College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board*, 527 U.S. 666, 669-70 (1999);

*Alden v. Maine*, 527 U.S. 706, 713 (1999). Thus, in *Hans v. Louisiana*, the Supreme Court held that the Eleventh Amendment also barred a citizen from bringing suit against his own state in federal court, as Plaintiffs seek to do here. 134 U.S. 1 (1890); *see also Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 238 (1985).

As we observed in *MCI Telecommunication Corp. v. Bell Atlantic-Pennsylvania*, there are only three narrowly circumscribed exceptions to Eleventh Amendment immunity: (1) abrogation by Act of Congress, (2) waiver by state consent to suit; and (3) suits against individual state officials for prospective relief to remedy an ongoing violation of federal law. 271 F.3d 491, 503 (3d Cir. 2001), *cert. denied*, 123 S. Ct. 340 (2002); *see also College Savings Bank*, 527 U.S. at 670. Here, the District Court held that Congress had validly abrogated the states' sovereign immunity in enacting the IDEA and that New Jersey had waived its Eleventh Amendment protection by accepting IDEA funds. We find, however, that the waiver analysis controls the outcome in this case and that, therefore, a lengthy discussion of abrogation is unnecessary. *See Douglas v. California Dept. of Youth Authority*, 271 F.3d 812, 820 (9th Cir.) ("If we conclude that California waived its sovereign immunity by accepting Federal Rehabilitation Act funds, we need not reach the question whether Congress validly abrogated the states' sovereign immunity under the Rehabilitation Act."), *amended by* 271 F.3d 910 (2001), *cert. denied*, 536 U.S. 924 (2002); *see also Koslow*, 302 F.3d at 169 (reserving consideration of abrogation of sovereign immunity under the Rehabilitation Act, while finding that Pennsylvania had waived its Eleventh Amendment protection).[10]

The Supreme Court recently reiterated that a state's sovereign immunity is " 'a personal privilege which it may waive at pleasure.' " *College Savings Bank*, 527 U.S. at 675 (quoting *Clark v. Barnard*, 108 U.S. 436, 447 (1883)). A state's waiver, however, " 'is altogether voluntary on the part of the sovereignty.' " *Id.* (quoting *Beers v. Arkansas*, 61

---

10. We address the third exception to Eleventh Amendment immunity—prospective injunctive relief—briefly in Part III.B, *infra*.

U.S. (20 How.) 527, 529 (1858)). A finding of waiver is appropriate only where the state's consent is "stated by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction." *Edelman v. Jordan*, 415 U.S. 651, 673 (1974). Courts are instructed to " 'indulge every reasonable presumption against waiver' " of sovereign immunity. *College Savings Bank*, 527 U.S. 682 (quoting *Aetna Ins. Co. v. Kennedy ex rel. Bogash*, 301 U.S. 389, 393 (1937)). In light of the Supreme Court's guidance, we have acknowledged that the "waiver by the state must be voluntary and our test for determining voluntariness is a stringent one." *MCI*, 271 F.3d at 503 (citations omitted).

In recent years, there have been a number of suits against sovereign states under federal remedial legislation and, as a result, substantial contributions to Eleventh Amendment jurisprudence. *See, e.g., Koslow*, 302 F.3d at 168. Based on the case law, we discern at least two ways in which a state may consent to suit in federal court and waive its Eleventh Amendment immunity. First, a state may make an unambiguous statement that it intends to subject itself to suit in, for example, state legislation or an interstate compact. *See, e.g., Petty v. Tennessee-Missouri Bridge Commission*, 359 U.S. 275, 277-82 (1959). The second scenario—the one relevant to the present appeal— occurs when Congress bestows a gift or gratuity, to which the state is not otherwise entitled, with the condition that the state waive its Eleventh Amendment immunity, and the state accepts that gift or gratuity. *See MCI*, 271 F.3d at 505 ("[T]he disbursement of federal monies are congressionally bestowed gifts or gratuities, which Congress is under no obligation to make, which a state is not otherwise entitled to receive, and to which Congress can attach whatever conditions it chooses.") (citation omitted). As is often the case, but not always, the gift or gratuity at issue is federal funds disbursed by Congress pursuant to its Article I spending powers. *See* U.S. CONST. art. I, § 8, cl. 1. *Compare MCI*, 271 F.3d at 513 (referring to the "gift or gratuity of the power to regulate local telecommunications competition under the Act" under the Commerce Clause) *with Koslow*, 302 F.3d at 172 (finding that federal financial assistance under the State Criminal Alien Assistance Act was a

Congressional gift or gratuity triggering a waiver of Pennsylvania's Eleventh Amendment immunity).

To the extent that the State disputes Congress's authority to exercise its spending authority in a manner that demands a waiver of sovereign immunity, we disagree. While the applicable test for assessing a state's waiver of sovereign immunity is unquestionably stringent, the recent cases have also made clear that " 'Congress may require a waiver of state sovereign immunity as a condition for receiving federal funds, even though Congress could not order the waiver directly.' " *Koslow*, 302 F.3d at 172 (quoting *Jim C. v. United States*, 235 F.3d 1079, 1081 (8th Cir. 2000)); *see also MCI*, 271 F.3d at 505 ("A fair reading of *College Savings* suggests that Congress may, pursuant to its regulatory power under [Article I of] the Commerce Clause, require a state to waive immunity in order to receive a benefit to which the state is not entitled absent a grant or gift from Congress.").

Based on this recent jurisprudence, we conclude that three requirements must be met before a court may determine that a state has waived its sovereign immunity by accepting a Congressional gift or gratuity: (1) Congress must state in clear and unambiguous terms that waiver of sovereign immunity is a condition of receiving the gift or gratuity; (2) in accepting the gift or gratuity, states must exercise that choice knowingly and voluntarily, fully cognizant of the consequence—waiver of Eleventh Amendment immunity; and (3) the federal program bestowing the gift or gratuity must be a valid exercise of Congress's authority. *See College Savings Bank*, 527 U.S. at 680-82 ("The classic description of an effective waiver of a constitutional right is the 'intentional relinquishment or abandonment of a known right or privilege.' ") (citations omitted); *Koslow*, 302 F.3d at 171-75 (discussing requirements of valid Spending Clause legislation); *MCI*, 271 F.3d at 503-06 ("Congress must be unmistakably clear and unambiguous in stating its intent to condition receipt of the gratuity on the state's consent to waive its sovereign immunity and to be sued in federal court.") (citation omitted).

We turn to the specific provisions of the IDEA on which the District Court and Plaintiffs rely in support of their contention that New Jersey waived its Eleventh Amendment immunity. As we noted above, the IDEA provides federal funds for state education programs in return for meeting a number of conditions. 20 U.S.C. §§ 1411 and 1412(a). There is no dispute in this case that New Jersey has accepted IDEA funds. One clear and unmistakable component of the IDEA is a state's waiver of Eleventh Amendment immunity. Section 1403 of the IDEA states: "A State shall not be immune under the eleventh amendment to the Constitution of the United States from suit in Federal court for a violation of this chapter." 20 U.S.C. § 1403(a). In addition, § 1403 should be read in conjunction with § 1415(i)(2)(A) which requires states to provide an opportunity for review of IDEA decisions in federal court. *See Bradley v. Arkansas Dept. of Education*, 189 F.3d 745, 753 (8th Cir. 1999), *overruled on other grounds*, *Jim C. v. United States*, 235 F.3d 1079 (8th Cir. 2000). Taken together, §§ 1403 and 1415 embody a clear and unambiguous expression of Congress's intent to condition a state's participation in the IDEA on the state's waiver of Eleventh Amendment immunity from suit in federal court. *See id.* Given the unmistakable loss of Eleventh Amendment immunity set forth in §§ 1403 and 1415 that would occur upon acceptance of funds disbursed pursuant to §§ 1411 and 1412, it would have been difficult for New Jersey not to comprehend the nature of the bargain when it accepted IDEA funds. If New Jersey felt that its Eleventh Amendment immunity were more important than funds for special education programs, then it could have preserved its constitutional protections by declining IDEA funds. In any event, the choice belonged to the State and the State alone. *See Koslow*, 302 F.3d at 171.

Notwithstanding the structural clarity of the IDEA, and particularly §§ 1403 and 1415, the State contends that several circumstances cast doubt on the clarity required to effect a valid waiver. First, the State observes that in other federal statutes which courts have found to set forth a waiver as a condition for receiving federal funds, specific language was included to make clear that acceptance of federal funds would trigger the waiver. Because § 1403 fails

to mention anything about acceptance of federal funds, New Jersey claims that waiver is not a clear condition of participation in the IDEA. Second, the State argues that because § 1403 is titled "Abrogation of state sovereign immunity," it understood that section as an attempt by Congress to abrogate sovereign immunity and not as a clear and unambiguous condition of waiver. Finally, the State contends that because it understood § 1403 as an attempt to abrogate, its consent to suit in federal court could not have been knowing or intentional because it assumed that there was no sovereignty for it to waive. None of these arguments are availing.

The State correctly observes that other federal legislation effecting a waiver of the states' sovereign immunity makes explicit reference to receipt of federal funds. For instance, amendments to the Rehabilitation Act enacted in 1986 contain such language:

> A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973 [29 U.S.C.A. § 794], title IX of the Education Amendments of 1972 [20 U.S.C.A. § 1681 et seq.], the Age Discrimination Act of 1975 [42 U.S.C.A. § 6101 et seq.], title VI of the Civil Rights Act of 1964 [42 U.S.C.A. § 2000d et seq.], or the provisions of any other Federal statute prohibiting discrimination *by recipients of Federal financial assistance.*

42 U.S.C. § 2000d-7(a)(1) (emphasis added). The Supreme Court held that § 2000d-7(a)(1) accomplished a valid and unambiguous waiver of the states' Eleventh Amendment immunity. *See Lane v. Pena*, 518 U.S. 187, 198-200 (1996); *Koslow*, 302 F.3d at 172 (Pennsylvania's receipt of federal funds under the State Criminal Alien Assistance Program effected a waiver of its Eleventh Amendment immunity for claims under § 504 of the Rehabilitation Act).

Despite the mention of "Federal financial assistance" in § 2000d-7(a)(1), we have stated previously that the waiver analysis does not hinge on the invocation of talismanic language, a point that the NJDOE concedes. *See MCI*, 271

F.3d at 513 ("It is true that the [Telecommunications Act of 1996] does not include magic words such as 'waiver' or 'immunity' or 'suit.' . . . We believe, however, that the language that Congress did use is sufficiently clear to establish that a state commission's decision will be subject to review in an action brought in federal court by an aggrieved party and sufficiently clear that the commission may be made a party to that federal court action."). In the context of the IDEA, our observation in *MCI* is instructive. The absence of any mention of receipt of federal funds does not change the fact that the language and the structure of the IDEA condition the receipt of federal funds on a state's waiver of sovereign immunity. *See Board of Education of Oak Park and River Forest High School Dist. No. 200 v. Kelly E.*, 207 F.3d 931, 935 (7th Cir.) (although § 1403(a) of the IDEA "does not use words such as 'consent' or 'waiver,' it is hard to see why that should matter. Congress did what it could to ensure that states participating in the IDEA are amenable to suit in federal court."), *cert. denied*, 531 U.S. 824 (2000). In this case, we see no upside to squinting myopically at the final phrase of § 2000d-7(a)(1), when the focus should remain on the text and structure of the IDEA. This is especially true where the operative waiver language —that which limits Eleventh Amendment immunity—is almost identical in § 2000d-7(a)(1) and § 1403 of the IDEA.

Second, the State argues that there is some meaning to the fact that the heading of § 1403 reads "Abrogation of sovereign immunity." We disagree. It is a well-settled rule of statutory interpretation that titles and section headings cannot limit the plain meaning of statutory text where that text is clear. *See Demore v. Kim*, 123 S.Ct. 1708, 1724 (2003) ("[T]he title of a statute has no power to give what the text of the statute takes away."); *I.N.S. v. St. Cyr*, 533 U.S. 289, 308 (2001) ("[A] title alone is not controlling.") (citing *Pennsylvania Dept. of Corrections v. Yeskey*, 524 U.S. 206, 212 (1998)); *Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R. Co.*, 331 U.S. 519, 528-29 (1947) ("[M]atters in the text which deviate from those falling within the general pattern are frequently unreflected in the headings and titles. Factors of this type have led to the wise rule that the title of a statute and the heading of a section cannot limit the plain meaning of the text."). We underscore

again that a plain reading of §§ 1411 and 1412, in conjunction with §§ 1403 and 1415, unmistakably conditions a state's receipt of IDEA funds on the waiver of sovereign immunity. *See Bradley*, 189 F.3d at 753 (although there has been "some unease" with the heading of § 1403, "[w]hen it enacted §§ 1403 and 1415, Congress provided a clear, unambiguous warning of its intent to condition a state's participation in the IDEA program and its receipt of federal IDEA funds on the state's waiver of its immunity from suit in federal court on claims made under the IDEA."). Therefore, the use of the term abrogation in the heading of § 1403 does not alter the condition of waiver of Eleventh Amendment immunity as reflected in the plain text of the IDEA.

Our discussion above should not be mistaken for a casual acceptance of legislative ambiguity. We agree with the Eighth Circuit that "§ 1403 has some shortcomings that limit its use as a clear expression of Congress's intent to condition a receipt of IDEA funds on a state's waiving its immunity . . . ." *Bradley*, 189 F.3d at 753. Without question, the condition of waiver of Eleventh Amendment immunity could have been accomplished with greater precision in the IDEA. Nevertheless, the inquiry should hinge on what Congress did accomplish, and in that regard, we agree that "Congress did what it could to ensure that states participating in the IDEA are amenable to suit in federal court." *Kelly E.*, 207 F.3d at 935.

Despite the clarity of the condition of waiver in the IDEA, the State also contends that it could not knowingly and intelligently waive its Eleventh Amendment immunity because it reasonably believed that Congress had already abrogated its sovereign immunity by operation of § 1403. According to the NJDOE, "Congress cannot indicate an intent to abrogate sovereign immunity, as it did in § 1403 of the IDEA, and expect the States to divine a Congressional intent to condition receipt of federal funds on the waiver of sovereign immunity." Appellants' Brief, at 25. This argument is borrowed from the Second Circuit's decision in *Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn*, where the court held that New York did not waive its sovereign immunity from suit under the Americans with

Disabilities Act and the Rehabilitation Act when it accepted federal funds for a state university medical school because New York had reasonably believed that Congress had abrogated its Eleventh Amendment immunity. 280 F.3d 98, 114 (2d Cir. 2001). The court stated that "a state accepting conditioned federal funds could not have understood that in doing so it was actually abandoning its sovereign immunity from private damages suits . . . . since by all reasonable appearances state sovereign immunity had already been lost." *Id.* (citations omitted). In the context of the IDEA, the Fifth Circuit adopted this rationale in holding that the state of Louisiana did not knowingly waive its Eleventh Amendment immunity by accepting IDEA funds. *See Pace v. Bogalusa City School Board*, 325 F.3d 609, 617 (5th Cir. 2003).[11]

For several reasons, we find the State's argument unavailing. To begin with, the reasoning proceeds from an unrealistic assumption. As we noted above, the fact that Congress employed the term abrogation does not change the language and structure of the IDEA, which clearly effects a waiver of Eleventh Amendment immunity. The NJDOE would have us believe that it could reasonably close its eyes to the integrated structure of §§ 1403, 1411, 1412, and 1415 of the IDEA and conclude that there would be no consequence each time it accepted IDEA funds. We remain skeptical.

In addition, the state's argument makes little sense from a temporal perspective. In an alternative Eleventh Amendment argument, the NJDOE contends that although Congress had attempted to abrogate its sovereign immunity, that attempt exceeded Congress's constitutional authority to do so. In support of this argument, the state cites a line of cases in which the Supreme Court invalidated six separate statutes purporting to limit the states' sovereign immunity. Appellants' Brief, at 19. This line of cases begins with the Supreme Court's June 1997 decision in *City of Boerne v. Flores*, 521 U.S. 507 (1997), and

---

11. On July 17, 2003, the Fifth Circuit granted appellant's petition for rehearing en banc in *Pace v. Bogalusa City School Board*, No. 01-31026, 2003 WL 21692677 (5th Cir. July 17, 2003).

includes decisions from 1999-2001.[12] What the State seems to be saying is that while it began to formulate, as early as June 1997, its belief that the purported abrogation in the IDEA might be unconstitutional, it nevertheless accepted IDEA funds without any awareness of the possible consequence of waiver of its sovereign immunity. The argument borders on the disingenuous, for the State readily accepted IDEA funds well after June 1997, during the critical time periods relevant to this dispute, that is, when the children named in the Complaint had failed to receive a free, appropriate public education. In *Garcia*, the Second Circuit recognized that a knowing waiver might result when a state had reason to believe that an attempt to abrogate was invalid. *See Garcia*, 280 F.3d at 114 n.4 ("We recognize that an argument could be made that if there is a colorable basis for the state to suspect that an express congressional abrogation is invalid, then the acceptance of funds conditioned on the waiver might properly reveal a knowing relinquishment of sovereign immunity. This is because a state deciding to accept the funds would not be ignorant of the fact that it was waiving its possible claim to sovereign immunity.").

For these reasons, in the context of this case, we are unpersuaded by the State's argument and the rationale borrowed from *Garcia* that the NJDOE reasonably believed that it had lost its sovereign immunity, and therefore, could not waive it. Given the NJDOE's emphatic assertions about the invalidity of the abrogation in § 1403, we believe that the state accepted IDEA funds with awareness of the consequences.

Our inquiry turns briefly to the third requirement of the test outlined above—the requirement that the federal program bestowing the gift or gratuity must be a valid exercise of Congress's authority. We note that the NJDOE addresses this issue only in passing in its Opening Brief.

---

12. *See also Florida Prepaid Postsecondary Educational Expense Board v. College Savings Bank*, 527 U.S. 627 (1999); *Kimel v. Florida Bd. of Regents*, 528 U.S. 62 (2000); *United States v. Morrison*, 529 U.S. 598 (2000); *Board of Trustees of the Univ. of Alabama v. Garrett*, 531 U.S. 356 (2001).

Appellants' Brief, at 27. We also note that any objections to the validity of Congress's exercise of authority under the IDEA would have been unavailing.

Because the gift bestowed on the states under the IDEA is federal funds, we understand Congress to proceed from its authority under the Spending Clause. U.S. Const. art. I, § 8, cl. 1. In *Koslow*, we recently addressed the requirements for a valid exercise of Congress's Spending Clause authority: "Spending Clause legislation must: (1) pursue the general welfare; (2) impose unambiguous conditions on states, so they can exercise choices knowingly and with awareness of the consequences; (3) impose conditions related to federal interests in the program; and (4) not induce unconstitutional action." 302 F.3d at 175 (citing *South Dakota v. Dole*, 483 U.S. 203, 207-08 (1987)). In enacting the IDEA, Congress identified a troubling gap in the provision of public education to disabled children and sought to allocate federal funds to remedy the problems, all in pursuit of the general welfare. As in *Dole*, where Congress conditioned receipt of federal highway funds on states' adoption of a minimum drinking age of twenty-one, we find the IDEA to be squarely within Congress's authority to disburse funds in pursuit of the general welfare. 483 U.S. at 207. As discussed above, the availability of federal funds was also clearly and unambiguously conditioned on a waiver of sovereign immunity. As to the relatedness requirement, we stated in *Koslow* that "one need only identify a discernible relationship" between the statutory condition and the federal interest in the program. 302 F.3d at 175. Here, Congress has clearly expressed an interest in remedying the problems inherent in providing a free, appropriate public education to disabled children. The funds disbursed through the IDEA are targeted directly at remedying those problems. And the condition of waiver of sovereign immunity from IDEA claims is directly related to promoting the substantive and procedural rights embodied in the IDEA. As a result, we cannot conclude that the financial inducements of the IDEA were "so coercive as to pass the point at which 'pressure turns into compulsion.'" *Dole*, 483 U.S. at 211 (citations omitted).

For the reasons set forth above, we hold that by accepting IDEA funds, the state of New Jersey waived its Eleventh Amendment immunity from claims brought pursuant to the IDEA in federal court. The condition of waiver was clear and unambiguous, the state was fully aware of the consequence, and the IDEA funds accepted by the state flowed from a valid exercise of Congress's authority under the Spending Clause. We note that two of our sister circuits addressing this same issue also held that the federal funds available under the IDEA are conditioned upon a state's waiver of sovereign immunity. *Oak Park*, 207 F.3d at 935; *Bradley*, 189 F.3d at 753; *but see Pace*, 325 F.3d at 617-18 (holding that the state of Louisiana's acceptance of IDEA funds did not effect a valid waiver of its Eleventh Amendment immunity).

## B. The Preliminary Injunction

The remaining issue on appeal for which we have jurisdiction is the preliminary injunction entered against Defendants compelling them to continue providing IEPs to E.S. and G.T., as long as they remain eligible for such services. To the extent that the state believes that sovereign immunity bars the entry of injunctive relief, our discussion above disposes of that argument. This is true for the individual state officials as well, for the state's waiver of Eleventh Amendment immunity renders them unable to assert a right that no longer exists. *See Bradley*, 189 F.3d at 754 ("The only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, *qua* entity, may possess, such as the Eleventh Amendment.") (internal quotations and citations omitted).[13]

The State's primary argument on appeal appears to be that it is an improper party to the injunction because Newark, and not the State, is the party responsible for providing the IEPs. Neither the IDEA nor case law supports the State's view. As we noted in Part I.A., *supra*, the State has the primary responsibility under the IDEA to provide a

---

13. For this reason, we need not address Plaintiffs' alternative argument that *Ex Parte Young*, 209 U.S. 123 (1908), permits Plaintiffs to proceed with their claims against the State Officials.

free, appropriate public education and to ensure compliance with the requirements of the Act. Therefore, we agree with the District Court that the State is a proper party to the preliminary injunction at this stage of the litigation.

Of course, it is incumbent on courts to proceed with a complete inquiry into the considerations relevant to a grant of injunctive relief. Specifically, the District Court should have considered: (1) the likelihood that the Plaintiffs would succeed on the merits of their claims; (2) the extent to which E.S. and G.T. would suffer irreparable harm without injunctive relief; (3) the potential harm to the Defendants if an injunction is issued; and (4) the public interest. *See Novartis*, 290 F.3d at 586. In its ruling from the bench, the District Court did not address these factors in its discussion of the Plaintiffs' request for injunctive relief.

Nevertheless, we are persuaded that the Court touched upon all of these factors in its analysis of the various issues raised in Defendants' motions to dismiss. Specifically, the District Court discussed the NJDOE's Complaint Investigation Reports which conceded that Newark had failed to provide an efficient system of identifying, locating, and evaluating disabled children, which, in turn, substantiated some of Plaintiffs' claims. In addition, the Court noted implicitly that E.S. and G.T. had already suffered from years of neglect, and the potential harm to them from continuing failure to provide appropriate educational services was readily apparent. In that regard, the potential harm to Defendants appears to have been minimal because they undertook to provide these services by participating in the IDEA. And finally, the maintenance of appropriate education services to disabled children is in the public interest, as Congress has detailed in the IDEA.

For these reasons, the District Court did not abuse its discretion in entering preliminary injunctive relief against the Defendants.

## IV. CONCLUSION

For the reasons set forth above, we will affirm the judgment of the District Court, insofar as it held that the

state of New Jersey had waived its Eleventh Amendment immunity by accepting IDEA funds. Furthermore, we will affirm the entry of preliminary injunctive relief against the state of New Jersey.

A True Copy:
  Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*