Sallie K. **MONTANYE**, Plaintiff,

v.

**WISSAHICKON SCHOOL DISTRICT,** Wissahickon School District Board of Directors; and Stanley J. Durtan, Superintendent of Schools, Defendants.

No. 02–8537.

United States District Court, E.D. Pennsylvania.

Nov. 3, 2005.

Sarah B. Dragotta, Law Office of Sarah B. Dragotta, Glenside, PA, for Plaintiff.

Joshua B. Axelrod, Michael I. Levin, Stacy G. Smith, Levin Legal Group, P.C., Huntingdon Valley, PA, for Defendants.

## *MEMORANDUM*

DuBOIS, District Judge.

## I. INTRODUCTION

Plaintiff, Sallie K. Montanye, a special education teacher in the Wissahickon School District (the "District"), filed this suit against the District, the Wissahickon School District Board of Directors (the "School Board"), Stanley J. Durtan, School District Superintendent ("Superintendent Durtan"), and the individual members of the School Board under 42 U.S.C. § 1983 and Article I § 26 of the Pennsylvania Constitution. The individual members of the School Board were dismissed as defendants by Memorandum and Order dated August 11, 2003. *See Montanye v. Wissahickon School Dist.,* 2003 WL 22096122 (E.D.Pa. Aug.11, 2003). In her Third Amended Complaint, plaintiff alleges that the remaining defendants violated her right to equal protection under the law. Currently before the Court is Defendants' Motion for Summary Judgment. For the reasons set forth below, Defendants' Motion is granted on the ground that plaintiff has failed to establish an equal protection claim.

## II. FACTS

The facts of this case are set forth in detail in a previous opinion in this case, *Montanye v. Wissahickon School Dist.,* 327 F.Supp.2d 510 (E.D.Pa.2004); therefore only the facts necessary to the summary judgment decision are included in this memorandum.

Plaintiff has been employed as a special education teacher by the District since 1994. Stipulations ¶ 1. In the 2001–2002 school year, she was assigned to the Wissahickon High School (the "School"). *Id.* ¶ 2. K., a 14-year old special education student in the ninth grade, was placed in plaintiff's classroom. *Id.* ¶ 6. K. had a history of emotional and psychological problems, which persisted during the 2001–2002 year. K. Dep. at 13:8–10, Pl. Ex. 85; WIN Team Student Log, Pl.Ex. 5.

In January 2002, plaintiff's classroom aide found a note written by K. expressing suicidal thoughts. Suicide Note, Pl.Ex. 1; Montanye Dep. at 7:2–16, Def. Ex. 46. The aide gave the note to plaintiff, who in turn showed it to Robert Anderson, the School principal ("Principal Anderson"). Montanye Dep. at 7:9–9:5. After speaking with K. and receiving the oral consent of K.'s mother, plaintiff found an outside psychologist, Dr. Sharron Rex, for K. to see. Montanye Dep. at 12:21–15:3; Montanye Aff. ¶ 6, Def. Ex. 4. In agreeing to see the psychologist, K. requested that plaintiff join her. Montanye Dep. at 25:18–19. With the verbal permission of K.'s mother, plaintiff drove K. to two therapy appointments, and attended both sessions with her. Montanye Aff. ¶ 13–14. Principal Anderson was aware that plaintiff made the therapy appointments and drove K. to the psychologist's office. *Id.* ¶ 16.

On March 19, 2002, the School "WIN team," a group of School staff members designated to assist "at risk" students, sent an unsigned letter to Principal Anderson and Judith Clark, the District's Assistant Superintendent, in which they questioned the appropriateness of plain-

tiff's interactions with K. WIN Team Letter, Def. Ex. 2. On May 1, 2002, pursuant to the due process requirements of *Cleveland Bd. of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), Superintendent Durtan sent plaintiff notice of a *Loudermill* hearing regarding her interactions with K. Notice of Allegations Letter, Def. Ex. 3. At the *Loudermill* hearing on May 23, 2002, plaintiff was represented by counsel. Montanye Dep. at 76:7–9. After the hearing, on June 3, 2002, Superintendent Durtan issued plaintiff a "Notice of Directives" letter (the "Directives letter"). Notice of Directives Letter, Def. Ex. 8. The letter informed plaintiff that her actions constituted "significant wrongdoing" and directed plaintiff to attend "an appropriate seminar or training session." *Id.* at 1. The letter also directed plaintiff to refrain from conduct not "expressly required or reasonably implied" by plaintiff's job; to comply with the laws and school district policies related to evaluating and referring students; and to follow specific procedures if plaintiff engaged in conduct with a student outside of her status as a teacher. *Id.* at 2–3. Plaintiff has been on leave from the District since the end of the 2002 school year. Exhaustion of Current Leave Letter, Def. Ex. 10; Sabbatical Letter, Def. Ex. 16.

## III. PROCEDURAL HISTORY

Plaintiff filed suit on November 19, 2002. In the original complaint, plaintiff named the District, the School Board, the individual members of the School Board, and Superintendent Durtan as defendants. The individual members of the School Board were later dismissed as defendants.

Count One of plaintiff's Third Amended Complaint alleges that defendants violated her right to equal protection of the law under the Fourteenth Amendment. Compl. ¶ 53. Count Two alleges an equal protection violation under the Pennsylvania Constitution, Art. I § 26. *Id.* ¶ 64. Plaintiff alleges that the District's actions resulted in her constructive discharge because she cannot return to work without facing "immediate discharge" under Superintendent Durtan's directives. *Id.* ¶ 42. Furthermore, plaintiff claims that she cannot find a position outside the District because the Directives letter remains in her employment file at the District. *Id.* ¶ 44.

Defendants moved to dismiss the Third Amended complaint pursuant to F.R.C.P. 12(b)(6) for failing to state a claim upon which relief can be granted. In an opinion dated March 17, 2004, this Court denied defendants' motion. *Montanye v. Wissahickon School Dist.*, 327 F.Supp.2d 510 (E.D.Pa.2004).

## IV. DISCUSSION

### A. *Standard for Summary Judgment*

A court should grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." F.R.C.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A "genuine" issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is "material" when it "might affect the outcome of the suit under the governing law." *Id.*

"In determining the facts, the court should draw all reasonable inferences in favor of the nonmoving party." *Id.* at 255, 106 S.Ct. 2505; *Highlands Ins. Co. v. Hobbs Group, LLC*, 373 F.3d 347, 351 (3d Cir.2004). The nonmoving party, howev-

er, cannot rely merely upon bare assertions, conclusory allegations, or suspicions to support a claim. *Fireman's Ins. Co. v. DuFresne,* 676 F.2d 965, 969 (3d Cir. 1982); *see also Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (stating that summary judgment must be granted if the evidence is "merely colorable" or "not significantly probative"). In a summary judgment motion, the moving party has the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. However, where the nonmoving party bears the burden of proof, it must "make a showing sufficient to establish the existence of [every] element essential to that party's case." *Equimark Commercial Finance Co. v. C.I.T. Financial Services Corp.,* 812 F.2d 141, 144 (3d Cir.1987), *citing Celotex,* 477 U.S. at 323–24, 106 S.Ct. 2548. As this Court noted in denying defendants' Motion to Dismiss in this case, "to survive a motion for summary judgment and ultimately prevail at trial, plaintiff will have to offer an ascending quantum of proof that defendants' actions were not rationally related to a legitimate government purpose and plead sufficient facts to support that contention." *Montanye,* 327 F.Supp.2d at 520.

### B. *Equal Protection "Class of One"*

■ Plaintiff's equal protection allegation is based on a "class of one" theory which allows a plaintiff who does not allege discrimination on the basis of membership in a protected class to pursue an equal protection claim. The United States Supreme Court has recognized that the Equal Protection Clause of the Fourteenth Amendment grants every person protection from "intentional and arbitrary discrimination" by state agents. *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (per curiam). A plaintiff asserting a "class of one" claim must show that: (1) defen-

dants, acting under color of state law, intentionally treated plaintiff differently from others similarly situated; and (2) there is no rational basis for the difference in treatment. *Id.; Jackson v. Gordon,* 145 Fed.Appx. 774, 776–77 (3d Cir.2005); *Willis v. Town of Marshall,* 426 F.3d 251, 263–64 (4th Cir.2005); *Montanye v. Wissahickon School Dist.,* 327 F.Supp.2d 510, 518 (E.D.Pa.2004). The "class of one" claim was intended for what the Seventh Circuit has recently called the "paradigmatic case," where a public official, with no conceivable basis for his action, penalizes a hapless private citizen. *Lauth v. McCollum,* 424 F.3d 631, 633 (7th Cir.2005). "As one moves away from the paradigmatic case, the sense of a wrong of constitutional dignity, and of a need for a federal remedy, attenuates. And when as in this case the unequal treatment arises out of the employment relation, the case for federal judicial intervention in the name of equal protection is especially thin." *Id.*

In *Olech,* the district court granted a motion to dismiss in a class of one case on the ground that the plaintiff did not allege an "orchestrated campaign of official harassment motivated by sheer malice." *Olech v. Village of Willowbrook,* 160 F.3d 386, 388 (7th Cir.1998). The Seventh Circuit reversed the district court, finding that plaintiff had sufficiently alleged that the defendant had no other reason for acting "other than a baseless hatred." *Id.* In a *per curiam* opinion, the Supreme Court affirmed the result reached by the Seventh Circuit on the ground that treating the plaintiff differently from other similarly situated persons was "irrational and wholly arbitrary." *Olech,* 528 U.S. at 565, 120 S.Ct. 1073. However, the *per curiam* opinion of the Supreme Court did not reach the "subjective ill will" theory relied on by the circuit court. *Id.* Only Justice Breyer, in his concurrence, discussed this issue. *Id.* at 565–66, 120 S.Ct. 1073 (Brey-

er, J., concurring) (emphasizing importance of plaintiff's allegations of "vindictive action," "illegitimate animus," and "ill will").

Several circuits have allowed plaintiffs who allege they were treated differently than those similarly situated to proceed on a class of one claim either by demonstrating that the action was motivated by animus or by showing that a government action lacks a rational basis. *See, e.g., Warren v. City of Athens,* 411 F.3d 697, 711 (6th Cir.2005); *Tapalian v. Tusino,* 377 F.3d 1, 5–6 (1st Cir.2004) (recognizing potential equal protection violation based on "malice or bad faith"); *Squaw Valley Development Corp. v. Goldberg,* 375 F.3d 936, 944 (9th Cir.2004) ("Where an equal protection claim is based on selective enforcement of valid laws, a plaintiff can show that the defendants' rational basis for selectively enforcing the law is a pretext for an impermissible motive.") (internal citations omitted); *De Muria v. Hawkes,* 328 F.3d 704, 707 (2d Cir.2003) (holding that allegation of impermissible motive and animus is sufficient to allege equal protection violation); *Bartell v. Aurora Public Schools,* 263 F.3d 1143, 1149 (10th Cir.2001) (denying plaintiff's equal protection class of one claim because no showing of spite). The Third Circuit, however, has only articulated the rational basis approach and not the "motivated by animus" standard. *Jackson,* 145 Fed.Appx. at 777.

▮▮▮ The courts that have addressed both the rational basis approach and the "motivated by animus" approach to analyzing class of one equal protection claims all agree that a plaintiff, in order to prevail, must establish that there is either no rational basis for the action of the decisionmaker or that the action of the decisionmaker is motivated by animus.[1] To succeed on an illegitimate animus class of one claim, the animus must be the sole cause of the complained-of action. *Albiero v. City of Kankakee,* 246 F.3d 927, 932 (7th Cir.2001). If there was a rational basis for the action of the decisionmaker, there is no equal protection class of one violation, regardless of whether the decision was motivated by animus. *Crowley v. McKinney,* 400 F.3d 965, 972 (7th Cir. 2005); *Nevel v. Village of Schaumburg,* 297 F.3d 673, 681 (7th Cir.2002); *Olech,* 160 F.3d at 388 ("If the defendant would have taken the complained-of action anyway, even if it didn't have the animus, the animus would not condemn the action; a tincture of ill will does not invalidate governmental action."). On this issue no circuit has held that the illegitimate animus of a decisionmaker voids a decision for which there was a rational basis. Because the Court finds that defendants' actions were supported by a rational basis, it need not address the question whether the Third Circuit would allow a plaintiff to proceed on an equal protection class of one claim by showing that the different treatment was the result of illegitimate animus by the decisionmaker.

1. *Plaintiff Was Not Intentionally Treated Differently from Others Similarly Situated*

In this case those "similarly situated" to plaintiff are other teachers in the District. *Montanye,* 327 F.Supp.2d at 519. Plaintiff alleges she was treated differently than

---

1. Some courts have developed a slightly different articulation of this standard by stating that a class of one plaintiff can demonstrate a lack of rational basis either by negating "every conceivable basis which might support" the action or by demonstrating that the action "was motivated by animus or ill-will." *See, e.g., Warren v. City of Athens,* 411 F.3d 697, 711 (6th Cir.2005). This difference in wording does not change the fact that animus alone is insufficient to negate an action supported by rational basis.

other teachers who engaged in similar conduct in two respects: (1) she was the first teacher to be subjected to a *Loudermill* hearing; and (2) she was the first teacher to receive a Directives letter. Pl. Resp. at 25. The Court will address each of these "firsts" in turn.

The proceeding known as a "*Loudermill* hearing" was first utilized in the Supreme Court case of *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) which held that a public employee who has a constitutionally protected interest in his or her job has a right to a hearing before being terminated. While the Supreme Court did not specify the procedures required at such a hearing, it stressed that the important elements of the hearing were notice and an opportunity to respond. *Id.* at 546, 105 S.Ct. 1487. Reflecting these requirements, the letter notifying plaintiff of her *Loudermill* hearing stated the allegations against her and directed her to meet with Superintendent Durtan to review the allegations and share her "side of the story." Notice of Allegations letter.

■ Defendants have submitted evidence of *Loudermill* hearings for other teachers held prior to plaintiff's hearing on May 23, 2002. Specifically, defendants have submitted two letters sent to other teachers prior to the letter sent to plaintiff, which was dated May 1, 2002. One letter was dated March 7, 2001; the other was dated October 12, 2001.[2] Also defendants have submitted a letter sent to another teacher dated May 1, 2002, the same

date as plaintiff's letter.[3] Notice of Allegations letters, Def. Ex. 47. In addition, defendants have submitted an affidavit from an attorney who attended two *Loudermill* hearings on behalf of teachers in the District in the mid–1990s. Herring Aff. ¶ 4, Def. Ex. 40. Plaintiff responded to that evidence by arguing that the letters did not actually result in *Loudermill* hearings but provided no evidence in support of this claim. Pl. Supp. Mem. at 14. Plaintiff's bare allegation, without further support, is not sufficient to create a genuine issue of material fact on this issue. Moreover, plaintiff has not produced any evidence that other teachers similarly situated did not receive *Loudermill* hearings. On the evidence of record, the Court concludes that plaintiff was not treated differently than other similarly situated teachers with respect to the *Loudermill* hearing.

■ Regarding the Directives letter, defendants have not argued that any other teacher received a letter like the one sent to plaintiff. In Superintendent Durtan's deposition he stated that he had sent other Notice of Directives letters in "multiple cases." Durtan Dep. at 53:13–20, Def. Ex. 49. However defendants have submitted no other evidence to establish that any such letters were sent. Defendants' failure to submit additional evidence on this issue leads the Court to discount such evidence. Even so, assuming *arguendo* that plaintiff was the first teacher to receive a Directives letter, plaintiff has the burden of showing that she was treated

---

**2.** The March 7, 2001 letter alleges that the teacher "engaged in neglect of duty, insubordination, willful violation of school laws, and improper conduct." The October 12, 2001 letter alleges that the teacher failed to complete students' IEPs (Individualized Education Plans) and CERs (Comprehensive Evaluation Reports) despite being directed to do so. Notice of Allegations letters, Def. Ex. 47.

**3.** The May 1, 2002 letter alleges that the teacher "engaged in willful neglect of duty, insubordination, incompetency, persistent negligence in the performance of duties, willful violation or [sic] school laws, and improper conduct growing out of the following: poor use of time and time management in connection with the preparation of an IEP and failure to complete the IEP." Notice of Allegations letters, Def. Ex. 47.

differently than others similarly situated. To establish such a claim, plaintiff would have to present evidence that other teachers who violated the same or similar District policies and federal law did not receive Directives letters, and she has not done so.[4] While defendants have presented evidence that other teachers were subjected to *Loudermill* hearings after being charged with violations similar to the charges against plaintiff, there is no evidence as to what happened to those teachers after the hearings. In short, the Court concludes plaintiff has not shown that defendants, in issuing the Directives letter to plaintiff, treated plaintiff differently than other teachers who took similar actions.

The second prong of the class of one equal protection claim requires plaintiff to establish that there was no rational basis for the action of the decisionmaker. The Court will proceed with the rational basis analysis notwithstanding its finding that plaintiff was not treated differently than other similarly situated teachers.

### 2. There Was a Rational Basis for Defendant's Treatment of Plaintiff

#### a. Rational Basis Standard

■■■ The second element of the "class of one" test in this case is whether there was a rational basis for defendants' alleged differential treatment of plaintiff in holding the *Loudermill* hearing and issuing the Directives letter. Under the rational basis standard, differential treatment does not violate the Equal Protection Clause if there is a rational relationship between the treatment and a legitimate government interest. *Heller v. Doe,* 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). Furthermore, an action that affects neither a fundamental right nor a suspect classification is accorded a strong presumption of validity. *Id.; Leheny v. City of Pittsburgh,* 183 F.3d 220, 226 (3d Cir.1999). The action will be upheld if there is "any reasonably conceivable state of facts that could provide a rational basis." *F.C.C. v. Beach Communications, Inc.,* 508 U.S. 307, 313, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). Those attacking the rationality have the burden of negating every conceivable basis which might support it. *Id.*

#### b. Defendants' Stated Bases for Conducting Loudermill Hearing and Issuing Directives Letter

Even if plaintiff was treated differently by being subjected to a *Loudermill* hearing, defendants argue that there was a rational basis for holding the hearing. Superintendent Durtan conducted the hearing after Assistant Superintendent Judith Clark received a copy of the letter from the School's WIN team regarding plaintiff's actions toward K. Durtan Aff. ¶ 12, Def. Ex. 34. The WIN team letter alleged that plaintiff made appointments for K. with a psychologist, drove K. to the therapy sessions, and attended those sessions with K. WIN Team Letter. Superintendent Durtan stated that he ordered the *Loudermill* hearing after receiving the WIN team letter, *inter alia,* because, if true, the allegations in the letter estab-

---

**4.** Plaintiff states that other teachers and school administrators transported students and were not reprimanded for their actions, and argues that driving K. to the psychologist did not violate any school district policy because there was no policy on transporting students. Pl. Resp. at 10–11. Plaintiff presents evidence from two Assistant Principals who testified that they drove students to wrestling practices and meets, a math competi-

tion, and home from school. Madden Dep. at 67:18–20, 73:22–74:1, Pl.Ex. 75; Bauer Dep. at 28:6–12, 36:3–5, Pl.Ex. 55. This evidence misses the mark. The issue presented in this case is not the driving of a student by a teacher. Rather the issue is plaintiff's conduct in connection with the examination of K. by a psychologist, which included driving K. to the psychologist's office and much more.

lished violations by plaintiff of District policies and federal special education law, and he wanted to hear her side of the story. Durtan Aff. ¶ 12.

Defendants argue that the same violations alleged in the WIN team letter led them to issue the Directives letter; the only differences between the two are timing and the amount of evidence. Before the *Loudermill* hearing, Superintendent Durtan had before him allegations that plaintiff had taken the charged actions. At the *Loudermill* hearing, plaintiff acknowledged that she made K.'s appointment with the psychologist, drove her to the psychologist's office, and sat through the two appointments with K.[5] Montanye Loudermill Aff. ¶¶ 6, 13, 15, Def. Ex. 4. Once the hearing was held, Superintendent Durtan had evidence that plaintiff had taken the actions alleged, and, after consulting with an attorney, concluded that these actions violated federal special education law and District policies. Durtan Aff. ¶ 45(a)-(d), (f). As a result, defendants argue that the Directives letter was necessary to ensure that plaintiff complied with federal special education law and followed District policies and procedures. Def. Mot. at 24–25.

The Court next analyzes defendants' position that plaintiff's actions violated federal special education law and District policies and procedures.

c. *Special Education Law: the Individuals with Disabilities Education Act (IDEA)*

■ The IDEA is a comprehensive scheme of federal legislation designed to meet the educational needs of children with disabilities. *M.A. ex rel. E.S. v. State–Operated School Dist. of City of Newark,* 344 F.3d 335, 338 (3d Cir.2003); *see generally* 20 U.S.C. § 1400 *et seq.* States are given federal funds to serve special education students provided that they comply with IDEA's substantive and procedural requirements. *School Committee of Burlington v. Dep't of Educ.,* 471 U.S. 359, 368, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985); *Beth V. by Yvonne V. v. Carroll,* 87 F.3d 80, 82 (3d Cir.1996); 20 U.S.C. § 1412(a)(11). This responsibility for compliance is shared with the local school districts serving the special education students. *M.A. ex rel. E.S.,* 344 F.3d at 340.

The IDEA sets forth specific procedures for determining whether a child is "disabled" and, therefore, eligible for services under the IDEA. 20 U.S.C. § 1414(a)-(b). Disability is broadly defined and includes children with "serious emotional disturbances." § 1401(3)(A)(I). Once a child is identified as disabled under the IDEA, the state, through the school district, must develop an Individualized Education Program (IEP), which has been described as the "modus operandi" of the IDEA. *Burlington,* 471 U.S. at 368, 105 S.Ct. 1996; *M.A. ex rel. E.S.,* 344 F.3d at 339; 20 U.S.C. § 1414(d). A student's IEP includes "a statement of the special education and related services ... to be provided to the child." 20 U.S.C. § 1414(d)(1)(A)(iii). An IEP must be in effect before special education and "related services" are provided to a student.[6] 34 C.F.R. § 300.342(b)(1)(i); *see also Board of Educ. of Hendrick Hudson Central*

---

**5.** Principal Anderson was aware of these actions taken by plaintiff and did not object to them. Durtan Aff. ¶ 26. Superintendent Durtan decided not to discipline plaintiff because Principal Anderson knew and acquiesced to her actions. *Id.* ¶ 45(j). Principal Anderson was terminated shortly after plain-

tiff's *Loudermill* hearing, allegedly for not appropriately disciplining plaintiff. Anderson Aff. ¶ 21, Pl.Ex. 51m.

**6.** This requirement is incorporated into Pennsylvania's administrative code. 22 Pa.Code § 14.102(a)(2)(xiv).

*School Dist. v. Rowley,* 458 U.S. 176, 203, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982) (holding that instruction and services provided under the IDEA "must comply with the child's IEP"); *Doe v. Maher,* 793 F.2d 1470, 1480 (9th Cir.1986) ("The special education provided the child must comport with his or her IEP, and no such services may be provided until an IEP is 'in effect.' ") (citations omitted); *Allstate Ins. Co. v. Bethlehem Area School Dist.,* 678 F.Supp. 1132, 1134 (E.D.Pa.1987) ("[N]o student identified as exceptional or handicapped ... may be assigned to a special education program without a written Individualized Education Program (IEP)."). "Related services" specifically includes psychological services. 20 U.S.C. § 1401(22). Under the IDEA, revision of a student's IEP is performed by the IEP team, which consists of the child's parents, at least one special education teacher, and a district curriculum specialist. 20 U.S.C. §§ 1414(d)(1)(B), 1414(d)(4)(A)(ii); *S.H. v. State–Operated School Dist. of City of Newark,* 336 F.3d 260, 264 (3d Cir.2003).

K. was identified as a student with disabilities under the IDEA and had an IEP in place for the 2001–2002 school year. Notice of Recommended Assignment, Def. Ex. 6. By arranging to provide K. with psychological services not within her existing IEP, plaintiff violated the IDEA. Plaintiff does not dispute that she made the appointment for K. with the psychologist, drove K. to the psychologist, and sat with K. through the first two sessions with the psychologist. Montanye Dep. at 24:25–36:3. As she acknowledged in her deposition, plaintiff was fully aware that

K.'s IEP did not provide for psychological services with Dr. Rex. Her testimony on that issue was as follows:

**Question:** So there was an IEP for the 2001–2002 school year; is that correct?

**Answer:** Yes, there was.

**Question:** And we can agree there was nothing on that IEP about taking this student to Dr. Rex?

**Answer:** Absolutely.

*Id.* at 42:5–10. Plaintiff also admitted during her deposition that she never convened a meeting of the IEP team to modify K.'s IEP to include psychological services. In fact, she testified that she felt that K.'s IEP was "inadequate" but also admitted that she never told anyone about this inadequacy. *Id.* at 48:19–21, 52:21–54:2. The Court concludes that it is undisputed that plaintiff took (and failed to take) these actions, and that these actions were in violation of the IDEA procedures.[7]

▮ The IDEA also requires that the child's parents provide informed consent before an initial evaluation or reevaluation of the child is performed and before the child is first provided with related services. 34 C.F.R. § 300.505(a)(1)(i)-(ii).[8] "Consent" requires that the parent agree in writing to the activity for which consent is sought. § 300.500(b)(1)(ii). While K.'s mother orally consented to plaintiff's actions, plaintiff admitted in her deposition that she did not follow the parental consent procedural safeguards required by the IDEA. Montanye Dep. at 270:24–271:18. Therefore, the Court concludes

---

**7.** Plaintiff argues that her actions were allowed under the IDEA because "no provision of the IDEA stops a teacher from acting to save the life of a child." Pl. Mem. at 32. While this may be true as a generalized statement, a teacher cannot circumvent federal law simply because her goals are noble. Furthermore there is no evidence that K. could

not have been provided with psychological services in compliance with the IDEA's procedural requirements.

**8.** This requirement is incorporated into Pennsylvania's administrative code. 22 Pa.Code § 14.102(a)(2)(xx).

that plaintiff did not obtain written consent as required by the IDEA.

### d. School District Policies

 The District has written procedures and guidelines for students with disabilities which reflect many of the requirements of the IDEA. Evaluation/IEP Process for Students with Disabilities: Procedures and Guidelines, Def. Ex. 11 (hereinafter "Guidelines"). The Guidelines set out the process by which a student is evaluated in order to determine whether the student needs special instruction. Id. at 5. Once a student is found in need of special instruction, the Guidelines set forth the procedure by which the student's IEP is developed. Id. at 13. If additional assessment beyond that included in the IEP is necessary, the Guidelines set forth the procedures for reevaluating the student. Id. at 11–12.

As stated above, K. had an IEP in place for the 2001–2002 school year. Notice of Recommended Assignment. The IEP largely focuses on improving K.'s academic skills, and does not refer to providing K. with psychological services, although there are sections of the IEP where such services may be included. There is no reference to psychological services in the section of K.'s IEP entitled "Special Education, Related Services and Supplementary Aids and Services," even though the IDEA defines "related services" to include psychological services. 20 U.S.C. § 1401(22); Notice of Recommended Assignment at 7–2. In fact, in the more than twenty pages of K.'s IEP, there are only two references to psychological services. The first reference appears in the section entitled "Linkages," which lists agencies, including Montgomery County Mental Health/Mental Retardation Case Management Services, that

are available to provide services to a student before the student leaves the school setting. This listing is only for reference, however, not for providing services, and K.'s parents are listed as the party responsible for making this connection. Id. at 5–2. The second reference in the IEP to K.'s specific emotional and psychological needs is found in the "Present Levels of Educational Performance," where it is noted that: "Occasionally K. may become overwhelmed with problems and emotions and will need to be excused so she can speak with an appropriate adult. She realizes that she is responsible for making up any work that was missed." Id. at 4–1. Compared to the rest of the IEP, which focuses on K.'s academic strengths and weaknesses and sets specific goals for improving her skills, these references to K.'s psychological health are minimal.

Based on the above evidence, the Court concludes that arranging to provide K. with psychological services outside of the school setting was not within K.'s IEP. Plaintiff does not directly dispute this fact; instead, she maintains that she followed K.'s IEP by giving her "supportive help" and speaking with her when she became "overwhelmed" during the school day. Pl. Mem. at 7. Speaking with K. during the school day is within K.'s IEP, as the IEP noted that K. may need to speak to an appropriate adult, such as plaintiff, when she becomes overwhelmed. Arranging for K. to see an outside psychologist, however, is not within the IEP, as plaintiff herself acknowledged in her deposition as quoted above. Montanye Dep. at 42:5–10; see Section IV(B)(2)(c) supra.

In order to provide K. with services not within her IEP, plaintiff was required to follow the District's Guidelines for modifying an IEP.[9] The Guidelines provide that

---

9. These procedures reflect the IDEA's procedural requirements for revising a student's IEP. See 20 U.S.C. §§ 1414(d)(1)(B), 1414(d)(4)(A)(ii).

before a student is provided with additional assessment or evaluation, the student's IEP team and a school psychologist must meet to determine whether the additional assessment is necessary. Guidelines at 11–12. Meeting with an outside psychologist qualifies as additional assessment since this service was not within K.'s IEP. The psychologist testified at her deposition that she asked K. questions during the therapy sessions in order to assess and properly treat her. Rex. Dep. at 18:6–14, Def. Ex. 39. If additional assessment is needed, the IEP team must follow specific procedures before obtaining that assessment. *Id.* at 12. The evidence is clear that plaintiff did not follow these procedures before she arranged for K. to see the psychologist, as plaintiff admitted during her deposition that she never convened a meeting of the IEP team. Montanye Dep. at 53:21–24.

Plaintiff also violated the District's Guidelines by failing to obtain written permission from K.'s mother before arranging for K. to see the psychologist.[10] The Guidelines require the child's parents to sign a "Permission to Evaluate" form before a student is reevaluated. Guidelines at 12. Plaintiff acknowledged in her deposition that she had only verbal permission from K.'s mother; she never obtained a signed "Permission to Evaluate" form. Montanye Dep. at 271:10–12. Plaintiff repeatedly asserts that K.'s mother approved of the arrangements plaintiff made for psychological services. However, the District's Guidelines require more than just parental "approval;" they require that the parent sign a specific form.

The Court, therefore, concludes that by making arrangements to provide K. with psychological services, plaintiff violated the District's Guidelines for special education students.

#### e. *Plaintiff's Violations of School District Policy and the IDEA Established a Rational Basis for Different Treatment*

Under the equal protection "class of one" theory plaintiff must establish that there was no rational basis for treating plaintiff differently than others similarly situated. Defendants argue that they had such a rational basis for holding the *Loudermill* hearing and issuing the Directives letter: preventing plaintiff from violating federal special education law and ensuring that plaintiff followed District policies and procedures with regard to special education students. Def. Mem. at 24–25. The Court agrees with defendants.

Defendants held the *Loudermill* hearing after receiving the WIN team letter which alleged that plaintiff had taken actions which they deemed inappropriate. Superintendent Durtan determined that, if the WIN team's allegations were true, plaintiff's actions were in violation of the IDEA and District procedures. Durtan Aff. ¶ 12. In order to appropriately investigate and weigh these allegations, Superintendent Durtan ordered a *Loudermill* hearing and retained the services of an attorney to represent the District at the hearing. Durtan Aff. ¶ 9; Durtan Dep. at 27:4–6. Because the *Loudermill* hearing was necessary for Superintendent Durtan to evaluate the WIN team's allegations and give plaintiff an opportunity to be heard, the Court concludes there was a rational basis for holding the *Loudermill* hearing.

In her affidavit presented at the *Loudermill* hearing, plaintiff admitted that she

---

**10.** This requirement reflects the IDEA's requirement that parents provide written consent before a child is reevaluated or provided with services. 34 C.F.R. §§ 300.500(b)(1)(ii), 300.505(a)(1)(i)-(ii).

made an appointment for K. to see a psychologist, twice drove K. to the psychologist, and sat through both of K.'s sessions with the psychologist. Montanye Loudermill Aff. ¶¶ 6, 13, 15. Based on this evidence, Superintendent Durtan determined, in conjunction with the District's attorney, that plaintiff's actions had exposed the district to legal liability and had violated federal special education law. Durtan Aff. ¶ 45–46; Durtan Dep. at 50:2–8. This determination led Superintendent Durtan to issue the Directives letter, which was written to ensure that plaintiff complied with District procedures. Durtan Aff. ¶ 49; Durtan Dep. at 49:18–50:11. The letter instructed plaintiff to engage only in activities that were "expressly required or reasonably implied" by her duties as a teacher and the IEPs of the students to whom she was assigned. Notice of Directives Letter at 2, Def. Ex. 8. Next, it directed plaintiff to "comply with legal processes and school district policies relating to evaluations and referrals of students," and informed her of the fact that the District's procedures are mandated by law and that failure to follow those procedures could result in legal liability both for the District and plaintiff. *Id.* The letter also ordered plaintiff to attend "an appropriate seminar or training session" on "where to draw the line." *Id.* at 1. Lastly, plaintiff was told that before engaging in conduct outside of her responsibilities as a teacher she must inform both the school principal and the personnel office about this conduct and obtain informed written consent from the student and the parent. *Id.* at 3.

Plaintiff argues that the District issued the Directives letter as part of its "campaign against special education" directed at cutting services to special education students. Compl. ¶ 40; Pl. Resp. at 21, 27. Of course if the District had such a policy, it would constitute an illegitimate animus. However, as discussed above, even if the District had such an illegitimate animus, the presence of this animus would not invalidate the District's actions toward plaintiff so long as there was a rational basis for its actions, demonstrating that they would have taken the action anyway. "Ill will must be the sole cause of the complained-of action" to establish liability in a class of one equal protection case. *Albiero v. City of Kankakee,* 246 F.3d 927, 932 (7th Cir.2001).

Plaintiff's violation of District policy and the IDEA gave the District a rational basis for issuing the Directives letter. Acting of her own accord plaintiff provided K. with services that were outside the IEP. Plaintiff arranged for these services without following the District's guidelines for special education students and the IDEA. An employee's demonstrated failure to follow an employer's rules and violation of federal law provide a rational basis for an employer to instruct an employee in how to comply with the law and the employer's rules.[11] Not only were the District's actions rational, but they furthered a legitimate government interest. The District has a significant interest in seeing its procedures followed, particularly when federal law requires those procedures.

## V. CONCLUSION

Given the facts and circumstances of this case, the Court does not doubt that plain-

---

**11.** At least one other court in the Third Circuit has found that an employer had a rational basis for dismissing an employee where that employee failed to follow internal procedures. In *Williams v. LaCrosse,* 2005 WL 927112 (E.D.Pa. Apr.20, 2005), the plaintiff was a probationary state trooper who was terminated after he failed to follow state police regulations in connection with a traffic stop. *Id.* at *1–2. Judge Pratter found that this failure gave plaintiff's supervising officer a "legitimate and rational basis" to sanction plaintiff. *Id.* at *8.

tiff thought her actions were justified and served K.'s best interests. However, the critical legal question before the Court is whether the defendants, by conducting a *Loudermill* hearing for plaintiff and issuing the Notice of Directives letter, treated plaintiff differently than others similarly situated, and, if so, whether defendants had a rational basis for plaintiff's differential treatment. The Court concludes that plaintiff was not treated differently than other similarly situated people, that there was a rational basis for her differential treatment, and that there are no genuine issues of material fact on either issue. Thus defendant's motion for summary judgment is granted and judgment is entered in favor of defendants, Wissahickon School District, Wissahickon School District Board of Directors, and Stanley J. Durtan, and against plaintiff.[12]

12. Defendants have made numerous alternative arguments as to why they should be granted summary judgment. In view of the Court's ruling on the equal protection claim, it will not address these additional arguments.